Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

KILEY REVEL, derivatively on behalf of
COMERICA INCORPORATED,

     Plaintiff,

     v.

CURTIS FARMER, JAMES J.
HERZOG, NANCY AVILA, MICHAEL
E. COLLINS, ROGER A. CREGG,
JACQUELINE P. KANE, RICHARD G.
LINDNER, BARBARA R. SMITH,
ROBERT S. TAUBMAN, REGINALD
M. TURNER, JR., NINA G. VACA,
MICHAEL G. VAN DE VEN, and
KEVIN DENICOLA,

     Defendants,

     and

COMERICA INCORPORATED, a
Delaware Corporation,

     Nominal Defendant.

Case No.:

DEMAND FOR JURY TRIAL

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Kiley Revel ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Comerica Incorporated ("Comerica" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Curtis C. Farmer ("Farmer"), James J. Herzog ("Herzog"), Nancy Avila ("Avila"), Michael E. Collins ("Collins"), Roger A. Cregg ("Cregg"), Jacqueline P. Kane ("Kane"), Richard G. Lindner ("Lindner"), Barbara R. Smith ("Smith"), Robert S. Taubman ("Taubman"), Reginald M. Turner, Jr. ("Turner"), Nina G. Vaca ("Vaca"), Michael G. Van de Ven ("Van de Ven"), and Kevin DeNicola ("DeNicola") (collectively, the "Individual Defendants," and together with Comerica, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Comerica, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for contribution against Defendants Farmer and Herzog under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire

and press releases published by and regarding Comerica, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Comerica's directors and officers from January 7, 2020 to May 29, 2023 (the "Relevant Period").

2.      Comerica is a Delaware Corporation with principal executive offices located at 1717 Main Street, MC 6404, Dallas, Texas 75201. Comerica is a financial services company that wholly owns a regional bank, Comerica Bank. Comerica operates in three primary markets—Texas, California, and Michigan—in addition to two secondary markets, Arizona and Florida. Additionally, Comerica has select businesses "operating in several other states, and in Canada and Mexico."

3.      Comerica has three major business segments: Commercial Bank, Retail Bank, and Wealth Management. These business segments are differentiated based on the customers served and products and services provided.

4.      Comerica's Commercial Bank business segment centers on meeting the needs of small and middle market businesses, multinational corporations and governmental entities. Comerica divides its Commercial Bank segment income primarily into two buckets: (1) interest income and (2) noninterest income. Interest income is primarily

composed of interest and fees on loans that Comerica Bank issues. Meanwhile, revenue generated from contracts with customers is what comprises the noninterest income Comerica earns in exchange for services. As such, noninterest income consists of card fees, service charges on deposit accounts, commercial loan servicing fees, and capital markets income. During the Relevant Period, Comerica derived the majority of its net income from the Commercial Bank segment.

5.      A major component of Comerica's Commercial Bank segment is the Direct Express Debit MasterCard ("Direct Express") program. The Direct Express program contributes to both interest income and noninterest income.

6.      The Direct Express program began in January 2008 when the United States Department of the Treasury (the "Treasury") selected Comerica Bank as its financial agent. The Treasury designed the Direct Express program to phase out paper checks in the distribution of Government benefits, including social security, supplemental security income, and veteran benefits.

7.      The Direct Express program provides millions of beneficiaries who do not have access to their own bank accounts a means of receiving an electronic payment in place of paper checks. The electronic payment comes in the form of the Direct Express card, which is a prepaid MasterCard debit card.

8.      From 2008 to March 2019, Comerica stated it opened over 8 million Direct Express accounts and served over $239 billion in benefits payments onto the prepaid debit

cards. Today, more than 4.5 million individuals receive their Social Security, veterans, or other federal benefit payments through Direct Express prepaid debit cards.

9.      Comerica receives somewhere between $100 million and $151 million per year from the U.S. Government to operate its Direct Express program. Comerica utilizes the majority of the Direct Express money to pay out third-party vendors who assist in running the program. Estimates of Comerica's participation in the Direct Express program suggest the Company receives nearly $3 billion low-cost deposits, or approximately 5% of the bank's overall deposit base as a result of the program.

10.     As an issuing bank of the Direct Express program, Comerica must comply with the terms of its contract with the U.S. Government (the "Federal Contract"), including the provision that all operations concerning the Direct Express program must be within the United States or an American territory.

11.     Of particular importance is Regulation E, which "provides a basic framework that establishes the rights, liabilities, and responsibilities of participants in electronic fund transfer systems such as automated teller machine transfers, telephone bill-payment services, point-of-sale (POS) terminal transfers in stores, and preauthorized transfers from or to a consumer's account (such as direct deposition and social security payments)."

12. In other words, if a consumer in an electronic fund transfer is a victim of fraud, Regulation E imposes requirements on institutions that facilitate these fund transfers, ***including the issuance of debit cards to recipients of federal funds***.[1]

13. Throughout the Relevant Period, Comerica represented that it "conducts due diligence prior to engaging with third part vendors and performs ongoing monitoring of vendor controls." And while the Company made public, general statements that potential fraud from third vendors could pose a risk, internally discussions were reflecting that executives were already aware of fraud issues with some of its vendors.

14. Moreover, although Comerica's Federal Contract required that the operation of its Direct Express program must be conducted within the U.S. or a related territory, the Company did not disclose to investors that its third-party vendors, such as i2c, inc. ("i2c"), for the Direct Express program were located internationally, such as in Pakistan.

15. Even as the Company failed to disclose publicly the reputational, legal, and financial risks associated with the fraud of its third-party vendors and failing to comply with the terms of the Federal Contract, inside the Company, Comerica executives were discussing the ramifications of these massive problems. For instance, a Comerica executive noted that Comerica faced a "serious contract violation" for allowing fraud disputes and data from Direct Express cardholders to be handled out of its vendor's office in Lahore, Pakistan.

---

[1] All emphasis is added unless otherwise indicated.

Verified Shareholder Derivative Complaint

16.    The truth emerged on May 29, 2023, when *American Banker,* an online newspaper, released an article titled "Comerica in 'Serious Violation' of Treasury's Direct Express Program." The article revealed that as early as 2020, executives were having internal discussions that the Company's use of vendors in Pakistan to handle fraud claims and customer data was in direct violation of the Federal Contract.

17.    On this news, the Company's stock price fell from $38.99 at the closing of trade on May 26, 2023, to $37.59 at the closing of trade on May 30, 2023. This represented a decline of $1.40 or 3.59% per share.

18.    Paul Lawrence, the former secretary for benefits in the U.S. Department of Veteran Affairs from 2018 to 2021, stated that "[a]ll of these government contracts basically say you have to be in the U.S. and the program has to be run by U.S. citizens."

19.    Further, an internal email from Nora Arpin, Comerica's senior vice president and director of government electronic solutions in 2020, stated "management for Reg E dispute processing is in Lahore which means that cardholder information is being shared with/sent to Lahore, which is a serious contract violation."

20.    Thus, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by: (1) failing to provide meaningful oversight over the vendors, i2c and Conduent, to whom it contracted out day-to-day operations of the Direct Express program; (2) failing to implement adequate fraud prevention measures and responses to customer complaints of fraud, likely making the Company in violation of Regulation E; and (3) failing to comply with the Federal Contract because of repeated

violations in the day-to-day operations of the Direct Express program, including but not limited to, the mishandling of fraud disputes and the improper handling of sensitive customer data out of a vendor's office in Pakistan (the "Direct Express Misconduct").

21.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Comerica's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

22.    To make matters worse, during the Relevant Period the Individual Defendants solicited shareholders to vote on various proposals through three proxy statements. On March 16, 2021, the Company filed with the SEC its proxy statement via Schedule 14A (the "2021 Proxy Statement"). The 2021 Proxy Statement was solicited on behalf of Defendants Farmer, Collins, Cregg, DiNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven. The 2021 Proxy Statement asked shareholders to vote on, *inter alia*, (1) the election of Defendant Farmer, Collins, Cregg, DeNicola, Kane, Lindner, Smith

Taubman, Turner, Vaca, and Van de Ven to the Board; (2) ratify EY as the independent registered public accounting firm for FY 2021; (3) approval of a non-binding advisory proposal approving executive compensation; (4) approval of amended and restated 2018 Long-Term Incentive Plan (the "Plan"); and (5) approval of the 2021 Employee Stock Purchase Plan. The 2021 Proxy Statement made the following changes to the Plan: (1) the addition of 1.97 million shares permitted for issuance; (2) consolidated the current employee equity incentive plan and the current non-employee director incentive plan; and (3) certain other administrative changes. Shareholders voted to approve all five solicitations. The misrepresentations and omissions set forth herein were material to shareholders in approving the Plan, who would not have approved the Plan had they been informed of the true financial state of the Company and the wrongdoing alleged herein.

23.     Then, on March 15, 2022, the Company filed with the SEC its proxy statement via Schedule 14A (the "2022 Proxy Statement"). The 2022 Proxy Statement was solicited on behalf of Defendants Farmer, Collins, Cregg, DiNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven. The 2022 Proxy Statement asked shareholders to vote on, *inter alia*, (1) the election of Defendant Farmer, Avila, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven to the Board; (2) ratify EY as the independent registered public accounting firm for FY 2021; and (3) approval of a non-binding advisory proposal approving executive compensation.

24.     Finally, on March 13, 2023, the Company filed with the SEC its proxy statement via Schedule 14A for 2023 (the "2023 Proxy Statement"). The 2023 Proxy

Statement was solicited on behalf of Defendants Farmer, Avila, Collins, Cregg, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven. The 2023 Proxy Statement asked shareholders to vote on, *inter alia*, (1) the election of Defendant Farmer, Avila, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven to the Board; (2) ratify EY as the independent registered public accounting firm for FY 2021; and (3) approval of a non-binding advisory proposal approving executive compensation.

25.     As a result of the false and misleading elements of the three proxy statements, shareholders were misled by the Individual Defendants to perpetually reelect them to the Board, to approve increased shares for the Plan, and to provide non-binding advisory approval on the compensation of directors and executives who were breaching their fiduciary duties.

26.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

27.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, Defendants Farmer and Herzog sold Company shares at inflated prices for combined total proceeds of over $3.2 million.

28.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 9.94

million shares of the Company's common stock were repurchased between February 2021 and April 2023 for over $759 million. As the Company stock was actually only worth $38.99 per share, the price at close on May 31, 2023, the Company overpaid by over $445 million in total.

29.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to remedy the Direct Express Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

30.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Farmer's and Herzog's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Comerica's Board of Directors (the "Board") cannot consider a demand to commence

litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

32.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

33.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

34.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

35.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

# PARTIES

## Plaintiff

36.    Plaintiff is a current shareholder of Comerica common stock and has continuously held Comerica common stock at all relevant times.

37.    Plaintiff is a citizen of Florida.

## Nominal Defendant Comerica

38.    Comerica is a Delaware corporation that considers California to be a "primary U.S. location" with a major office located at 601 South Figueroa Street, Suite 100, Los Angeles, CA 90017. Comerica common stock trades on the NYSE under the ticker symbol "CMA." Comerica is a financial services company and is the parent company of Comerica Bank. Comerica is a citizen of Delaware.

## Defendant Farmer

39.    Defendant Farmer has served as the Company's CEO since April 2019 and as the Chairman of the Board since January 2020. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Farmer beneficially owned 237,725 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Farmer owned approximately $16.74 million worth of Comerica common stock as of that date.

40.    For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Farmer received $8.73 million in total compensation from the Company. This included $1.047 million in salary, $3.854 million in stock awards, $426,853 in option

Verified Shareholder Derivative Complaint

awards, $3.15 million in non-equity incentive plan compensation, $187,153 in change in pension value and nonqualified deferred compensation earnings, and $67,564 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Farmer received $7.696 million in total compensation from the Company. This included $1.015 million in salary, $3.430 million in stock awards, $374,728 in option awards, $2.740 million in non-equity incentive plan compensation, $114,858 in change in pension value and nonqualified deferred compensation earnings, and $19,327 in all other compensation. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Farmer received $5.014 million in total compensation from the Company. This included $976,154 in salary, $2.862 million in stock awards, $326,141 in option awards, $658,125 in non-equity incentive plan compensation, $158,455 in change in pension value and nonqualified deferred compensation earnings, and $32,649 in all other compensation.

41.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Farmer sold 39,006 shares of Company common stock on inside information for which he received approximately $2,635,326 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

42.     Upon information and belief, Defendant Farmer is a citizen of Texas.

43.     The 2023 Proxy Statement stated the following about Defendant Farmer:

Mr. Farmer has been Chairman (since January 2020); Chief Executive Officer (since April 2019); President (since April 2015); Vice Chairman (April 2011 to April 2015); and Executive Vice President (October 2008 to April 2011) of Comerica Incorporated and Comerica Bank. Prior to joining Comerica, Mr. Farmer served as Executive Vice President and Wealth Management Director of Wachovia Corporation from October 2005 to October 2008. During his 23 years of service to Wachovia, he held a variety of positions of increasing scope and responsibility. Mr. Farmer will join the board of directors of Texas Instruments Incorporated effective April 1, 2023.

Mr. Farmer is an experienced financial services executive who has been nominated to serve on the Board because of his extensive skills and institutional knowledge in the areas of business and consumer banking. As Chairman, President and CEO of Comerica, he has a deep understanding of all aspects of Comerica's core businesses and markets and has also supervised Comerica's credit, marketing, enterprise technology and operations functions. At Comerica, Mr. Farmer successfully guided the Commercial Bank, Retail Bank and Wealth Management — along with several support functions — through the GEAR Up efficiency initiative and laid the foundation for Comerica to undergo the digital transformation that is underway today. Mr. Farmer is active in the banking industry and serves on the boards of the Bank Policy Institute and The Clearing House. He also has broad experience in wealth management and leadership through his long tenure at Wachovia Corporation.

## **Defendant Herzog**

44.    Defendant Herzog is the Company's Senior Executive Vice President (since January 2023) and Chief Financial Officer (since February 2020). Previously, Defendant Herzog served as Executive Vice President and Treasurer from November 2011 to February 2020. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Herzog beneficially owned 39,596 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24,

2023, was $70.41, Defendant Herzog owned approximately $2.79 million worth of Comerica common stock as of that date.

45.     For the 2022 Fiscal Year, Defendant Herzog received $2.981 million in total compensation from the Company. This included $620,981 in salary, $1.101 million in stock awards, $121,994 in option awards, $1.125 in non-equity incentive plan compensation, and $12,200 in all other compensation.  For the 2021 Fiscal Year, Defendant Herzog received $2.680 million in total compensation from the Company. This included $568,731 in salary, $950,153 in stock awards, $103,826 in option awards, $1.026 million in non-equity incentive plan compensation, $19,894 in change in pension value and nonqualified deferred compensation earnings, and $11,600 in all other compensation. For the 2020 Fiscal Year, Defendant Herzog received $1.986 million in total compensation from the Company. This included $620,981 in salary, $704,929 in stock awards, $80,093 in option awards, $255,150 in non-equity incentive plan compensation, $429,177 in change in pension value and nonqualified deferred compensation earnings, and $11,4000 in all other compensation.

46.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Herzog sold 8,822 shares of Company common stock on inside information for which he received approximately $600,754 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

47. Upon information and belief, Defendant Herzog is a citizen of Texas.

48. The Company's website[2] states the following about Defendant Herzog:

Senior Executive Vice President, Chief Financial Officer

James J. Herzog is Senior Executive Vice President and Chief Financial Officer for Comerica Incorporated. He is a member of Comerica's Management Executive Committee. Herzog has direct management of Finance, overseeing Accounting, Business Finance, Investor Relations, Treasury, Economics, Procurement and Corporate Planning & Development, with responsibility for all financial reporting.

Herzog assumed his current position in February 2020, after serving as Executive Vice President, Treasurer. Since joining Comerica in 1984, he has led various functions within the bank, such as Corporate Planning and Forecasting, Finance Systems, Pricing, and Business Finance, before being named Treasurer in late 2011.

Herzog holds a bachelor's degree in finance from Oakland University, where he also earned his master's degree in business administration.

Herzog is a Certified Management Accountant.

**Defendant Avila**

49. Defendant Avila has served as a Company director since 2022. As a member of the Board, Defendant Avila serves on the Enterprise Risk Committee. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Avila beneficially owned 1,596 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Avila owned approximately $112,374.36 worth of Comerica common stock as of that date.

---

[2] *James J. Herzog*, COMERICA (June 2023), https://comerica.mediaroom.com/senior-leadership-team?item=34706.

50.     For the 2022 Fiscal Year, Defendant Avila received $221,254 in total compensation from the Company. This included $101,250 in fees earned or paid in cash and $120,004 in stock awards.

51.     Upon information and belief, Defendant Avila is a citizen of Texas.

52.     The 2023 Proxy Statement states the following about Defendant Avila:

Ms. Avila (formerly known as Nancy Flores) has been Executive Vice President and Chief Information and Technology Officer for McKesson Corporation, a global leader in healthcare supply chain management solutions, retail pharmacy, community oncology and specialty care and healthcare information solutions, since January 2020. Prior to joining McKesson, Ms. Avila served as Vice President and Chief Information Officer at Johnson Controls, Inc., a manufacturer of car batteries and interior parts for combustion engine and hybrid electric vehicles, as well as energy-efficient HVAC systems, from March 2018 to December 2019. Before that, she spent 22 years at Abbott Laboratories, Inc., a global healthcare company, in several leadership roles, including, most recently, Vice President, Business and Technology Services, from June 2015 to February 2018.

With 25 years of technology sector experience, Ms. Avila brings to Comerica's Enterprise Risk Committee a wealth of expertise addressing regulatory, technology, cyber and financial risk. Her knowledge in these areas, as well as the areas of software, infrastructure, application development tools and processes, operations, technology products and data and analytics, strengthens the Board's ability to advise on these important areas.

**Defendant Collins**

53.     Defendant Collins has served as a Company director since 2016. As a member of the Board, Defendant Collins serves as the Chair of the Enterprise Risk Committee and as a member of the Audit Committee and the Qualified Legal Compliance Committee. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Collins beneficially owned 11,221 shares of Comerica common stock. Given that the price per

share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Collins owned approximately $790,070 worth of Comerica common stock as of that date.

54.    For the 2022 Fiscal Year, Defendant Collins received $262,504 in total compensation from the Company. This included $142,500 in fees earned or paid in cash and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Collins received $246,149 in total compensation from the Company. This included $136,250 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant Collins received $215,002 in total compensation from the Company. This included $135,000 in fees earned or paid in cash and $105,002 in stock awards.

55.    Upon information and belief, Defendant Collins is a citizen of Washington D.C.

56.    The 2023 Proxy Statement states the following about Defendant Collins:

Mr. Collins has served as the Chair and Senior Counselor of Blake Collins Group, a public relations and communications firm, since July 2013. He was an advisor to The Bancorp, Inc., a financial services institution, from July 2013 to November 2016. He also served as a consultant to the Federal Reserve Bank of Cleveland, a bank regulator, from November 2014 to March 2015and as Executive Vice President and Lending Officer of the Federal Reserve Bank of Philadelphia, a bank regulator, from June 2009 to June 2011, where he worked in various capacities beginning in 1974. He was the President and Chief Executive Officer of TD Bank USA, a financial services institution, from March 2013 to July 2013 and Executive Vice President of TD Bank Group, a group of affiliated financial services entities, where he managed audit, legal, compliance, anti-money laundering, regulatory, loan review and government affairs functions from November 2011to July 2013. He also was Executive Vice President of TD Bank Group and Strategic Advisor to TD

Bank USA from September 2011 to October 2011. He was a director of Higher One Holdings, Inc. from April 2015 to August 2016.

As a former banking and finance executive with nearly 40 years of regulatory experience, including service with the Federal Reserve Banks of Cleveland and Philadelphia, Mr. Collins brings to the Board a number of key skills, including a strong background in risk management and relevant business management experience, as well as a deep understanding of the financial services industry, including bank regulation. As the Chair of our Enterprise Risk Committee, his experience in identifying, assessing and managing risk exposures of large, complex financial firms allows Mr. Collins to provide invaluable insight to Comerica.

### **Defendant Cregg**

57.    Defendant Cregg has served as a Company director since. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Cregg beneficially owned 57,739 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Cregg owned approximately $4.06 million worth of Comerica common stock as of that date.

58.    For the 2022 Fiscal Year, Defendant Cregg received $287,504 in total compensation from the Company. This included $167,500 in fees earned or paid in cash and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Cregg received $264,665 in total compensation from the Company. This included $154,766 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant Cregg received $215,002 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $105,002 in stock awards.

59.    Upon information and belief, Defendant Cregg is a citizen of Arizona.

60.     The 2023 Proxy Statement states the following about Defendant Cregg:

Mr. Cregg was President, Chief Executive Officer and a director of AV Homes, Inc., a developer and homebuilder in Florida, Arizona, Texas and North Carolina, from December 2012 to October2018. From August 2011 through November 2012, he served as Senior Vice President of Finance and Chief Financial Officer of The ServiceMaster Company, a residential and commercial service company. He served as Executive Vice President of PulteGroup, Inc. (formerly known as Pulte Homes, Inc.), a national homebuilding company, from May 2003 to May 2011 and Chief Financial Officer of PulteGroup, Inc. from January 1998 to May 2011. He served as Senior Vice President of PulteGroup, Inc. from January 1998 to May 2003. He was a director of the Federal Reserve Bank of Chicago, Detroit Branch, from January 2004 to December 2009 and served as Chair from January to December 2006. He has been a director of Sterling Construction Company, Inc. since May 8, 2019.

As the former Chief Executive Officer and Chief Financial Officer of public companies, Mr. Cregg has demonstrated the leadership capability and extensive knowledge of complex financial and operational issues necessary to chair our Audit Committee.

**Defendant Kane**

61.     Defendant Kane has served as a Company director since 2008. As a member of the Board, Defendant Kane serves as the Chair of the Governance, Compensation, and Nominating Committee. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Kane beneficially owned 45,945 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Kane owned approximately $3.23 million worth of Comerica common stock as of that date.

62.     For the 2022 Fiscal Year, Defendant Kane received $252,504 in total compensation from the Company. This included $132,500 in fees earned or paid in cash

and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Kane received $236,149 in total compensation from the Company. This included $126,250 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant Kane received $230,002 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $105,002 in stock awards.

63.     Upon information and belief, Defendant Kane is a citizen of California.

64.     The 2023 Proxy Statement stated the following about Defendant Kane:

Ms. Kane is retired. She served as Executive Vice President, Human Resources and Corporate Affairs, from February 2015 to January 2016, Senior Vice President, Human Resources and Corporate Affairs, from December 2004 to February 2015, Senior Vice President, Human Resources from June 2004 to December 2004, and Vice President, Human Resources from March 2004 to May 2004 for The Clorox Company, a manufacturer and marketer of consumer products. From March 2003 to January 2004, she was Vice President, Human Resources and Executive Leadership for The Hewlett-Packard Company, a technology company. Prior to her role at The Hewlett-Packard Company, Ms. Kane spent 22 years in human resources in the financial services industry.

As a former senior executive with experience in human resources, including compensation matters, as well as experience in several of our key geographic markets, Ms. Kane has a unique and insightful perspective to offer the Board. As Chair of our Governance, Compensation and Nominating Committee, she is able to use her experience and perspectives to offer best practices advice.

**Defendant Lindner**

65.     Defendant Lindner has served as a Company director since 2008. As a member of the Board, Defendant Lindner serves on the Audit Committee, Governance, Compensation, and Nominating Committee, and the Qualified Legal Compliance Committee. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant

21

Lindner beneficially owned 69,365 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Lindner owned approximately $4.88 million worth of Comerica common stock as of that date.

66.    For the 2022 Fiscal Year, Defendant Lindner received $231,254 in total compensation from the Company. This included $111,250 in fees earned or paid in cash and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Lindner received $219,899 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant Lindner received $215,002 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $105,002 in stock awards.

67.    Upon information and belief, Defendant Lindner is a citizen of Texas.

68.    The 2023 Proxy Statement states the following about Defendant Lindner:

Mr. Lindner is retired. He served as Senior Executive Vice President and Chief Financial Officer of AT&T, Inc. (formerly SBC Communications, Inc.), a telecommunications company, from May 2004to June 2011. From October 2000 to May 2004, he was the Chief Financial Officer of Cingular Wireless LLC (now AT&T Mobility LLC), a wireless telecommunications company. From October2002 to March 2007, he served as a director of Sabre Holdings.

As the former Chief Financial Officer of AT&T, Inc., Mr. Lindner has demonstrated leadership capability and extensive knowledge of complex financial and operational issues facing large organizations. In addition. Lindner is able to draw upon, among other things, his knowledge of several of our key geographic markets that he has gained through experience in the telecommunications industry.

**Defendant Smith**

69.     Defendant Smith has served as a Company director since 2017. As a member of the Board, Defendant Smith serves as the Independent Facilitating Director and as a member of the Governance, Compensation, and Nominating Committee. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Smith beneficially owned 12,072 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Smith owned approximately $849,989 worth of Comerica common stock as of that date.

70.     For the 2022 Fiscal Year, Defendant Smith received $261,254 in total compensation from the Company. This included $141,250 in fees earned or paid in cash and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Smith received $242,399 in total compensation from the Company. This included $132,500 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant Smith received $235,002 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $105,002 in stock awards.

71.     Upon information and belief, Defendant Smith is a citizen of Texas.

72.     The 2023 Proxy Statement states the following about Defendant Smith:

Ms. Smith has been President, Chief Executive Officer and a director of Commercial Metals Company, a manufacturer, recycler and marketer of steel and metal products, since September2017, and Chairman since January 2018. She joined Commercial Metals Company as Senior Vice President and Chief Financial Officer in 2011 and served in that capacity until she was promoted to Chief Operating Officer in 2016 and President and Chief Operating Officer in January 2017.Previously, she served as Vice President and Chief Financial

Officer of Gerdau Ameristeel from 2007-2011 and as Treasurer from 2006-2007. She also served as Senior Vice President and Chief Financial Officer of FARO Technologies, Inc. from February 2005 to July 2006. During the more than 20 prior years, Ms. Smith held positions of increasing financial leadership with Alcoa Inc. She was a director of Minerals Technologies Inc. from 2011 to July 2017, where she served as Chair of the Audit Committee and a member of the Compensation Committee.

Ms. Smith brings to the Board a number of key skills, including relevant business leadership and management experience, expertise in geographic markets in which Comerica has a presence, including our headquarters market, and significant financial expertise garnered through the chief financial officer and treasury roles she has held during her professional career. Additionally, her strong leadership experience is instrumental in her service as Facilitating Director.

**Defendant Taubman**

73.    Defendant Taubman has served as a Company director since 2000.  As a member of the Board, Defendant Taubman serves on the Enterprise Risk Committee. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Taubman beneficially owned 53,885 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Taubman owned approximately $3.79 million worth of Comerica common stock as of that date.

74.    For the 2022 Fiscal Year, Defendant Taubman received $221,254 in total compensation from the Company. This included $101,250 in fees earned or paid in cash and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Taubman received $209,899 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant

Taubman received $205,002 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $105,002 in stock awards.

75.     Upon information and belief, Defendant Taubman is a citizen of Michigan.

76.     The 2023 Proxy Statement states the following about Defendant Taubman:

Mr. Taubman is Chairman and CEO of The Taubman Realty Group LLC, which owns, develops and operates regional shopping centers nationally. He was Chairman of Taubman Centers, Inc. From December 2001 to December 2020; President and Chief Executive Officer of Taubman Centers, Inc. from August 1992 to December 2020 and President of The Taubman Realty Group until March 2021. He has been Chairman of The Taubman Company LLC, a shopping center management company engaged in leasing, management and construction supervision, since December 2001 and has been President and CEO of The Taubman Company LLC since September 1990. He was a director of Sotheby's Holdings, Inc. from 2000 until his retirement from that Board in May 2016 and served as a director of Taubman Centers, Inc. from 1992 until December 2020.

As an executive involved in real estate development and operations, Mr. Taubman has demonstrated leadership capability and brings key experience in the real estate sector. He also brings insight through experience in many of Comerica's geographic markets.

**Defendant Turner**

77.     Defendant Turner has served as a Company director since 2005. As a member of the Board, Defendant Turner serves as a member of the Audit Committee and the Qualified Legal Compliance Committee.  According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Turner beneficially owned 43,630 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Turner owned approximately $3.07 million worth of Comerica common stock as of that date.

78.   For the 2022 Fiscal Year, Defendant Turner received $231,254 in total compensation from the Company. This included $111,250 in fees earned or paid in cash and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Turner received $219,899 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant Turner received $215,002 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $105,002 in stock awards.

79.   Upon information and belief, Defendant Turner is a citizen of Michigan.

80.   The 2023 Proxy Statement states the following about Defendant Turner:

Mr. Turner was an attorney with Clark Hill, a law firm, from April 2000 to December 2022 and served on the firm's Executive Committee from January 2016 to December 2022. He has been a director of Masco Corporation since March 1, 2015. Mr. Turner is active in public service and with civic and charitable organizations, serving in leadership positions with the American Bar Association, the Detroit Public Safety Foundation, the Detroit Institute of Arts, the Community Foundation for Southeast Michigan and the Hudson-Webber Foundation.

As a lawyer, Mr. Turner has a unique legal and risk management perspective to offer the Board. He also has extensive involvement and experience in community affairs.

**Defendant Vaca**

81.   Defendant Vaca has served as a Company director since 2008. As a member of the Board, Defendant Vaca serves on the Governance, Compensation, and Nominating Committee. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Vaca beneficially owned 35,359 shares of Comerica common stock. Given that the price

per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Vaca owned approximately $2.49 million worth of Comerica common stock as of that date.

82.    For the 2022 Fiscal Year, Defendant Vaca received $221,254 in total compensation from the Company. This included $101,250 in fees earned or paid in cash and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Vaca received $209,899 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant Vaca received $205,002 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $105,002 in stock awards.

83.    Upon information and belief, Defendant Vaca is a citizen of Texas.

84.    The 2023 Proxy Statement states the following about Defendant Vaca:

Ms. Vaca has been Chairman and Chief Executive Officer of Pinnacle Technical Resources, Inc., a global workforce solutions provider offering staffing, managed services, payrolling and independent contractor compliance and a proprietary talent platform, since she founded the company in October 1996. She also has been Chairman and Chief Executive Officer of Vaca Industries Inc., a privately-held management company, since April 1999. She has been a director of Cinemark Holdings, Inc. since November 2014 and also served as a director of Kohl's Corporation from March 2010 to May 2019. In 2014, the Obama Administration appointed Ms. Vaca as a Presidential Ambassador for Global Entrepreneurship. Ms. Vaca is also a Henry Crown Fellow at the Aspen Institute and a lifetime member of the Council on Foreign Relations.

As a chief executive officer with experience in talent solutions, managed services and information technology, as well as successful entrepreneurial endeavors in the U.S. and abroad, Ms. Vaca offers unique and insightful perspective to the Board.

**Defendant Van de Ven**

85.     Defendant Van de Ven has served as a Company director since 2016. As a member of the Board, Defendant Van de Ven serves as a member of the Governance, Compensation, and Nominating Committee. According to the 2023 Proxy Statement, as of February 24, 2023, Defendant Van de Ven beneficially owned 16,221 shares of Comerica common stock. Given that the price per share of the Company's stock at the closing of trade on February 24, 2023, was $70.41, Defendant Van de Ven owned approximately $1.14 million worth of Comerica common stock as of that date.

86.     For the 2022 Fiscal Year, Defendant Van de Ven received $242,861 in total compensation from the Company. This included $122,857 in fees earned or paid in cash and $120,004 in stock awards. For the 2021 Fiscal Year, Defendant Van de Ven received $209,899 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant Van de Ven received $205,002 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $105,002 in stock awards.

87.     Upon information and belief, Defendant Van de Ven is a citizen of Texas.

88.     The 2023 Proxy Statement states the following about Defendant Van de Ven:

Mr. Van de Ven is an executive advisor (since January 2023) of Southwest Airlines Co., a passenger airline. Previously, he served as President from September 2021 to December 2022, Chief Operating Officer from May 2008 to September 2022, Executive Vice President from May 2008 to January 2017, Chief of Operations from September 2006 to May 2008, Executive Vice President Aircraft Operations from November 2005 through August 2006, and

Senior Vice President Planning from August 2004 to November 2005. He joined Southwest in 1993 and held various positions and responsibilities for the airline including financial planning and analysis, fleet planning, aircraft operations and schedule planning. He also served as senior audit manager for Ernst & Young LLP for 9 years ending in 1993 and is a licensed CPA.

Mr. Van de Ven brings to the Board a number of key skills, including relevant business management experience, a strong background in risk management, expertise in geographic markets in which Comerica has a presence, particularly our headquarters market, and a deep understanding of financial planning and accounting, among others.

### **Defendant DeNicola**

89.     Defendant DeNicola served as a Company director from 2006 until April 26, 2022. During his time on the Board, Defendant DeNicola served on the Audit Committee, Enterprise Risk Committee, and Qualified Legal Compliance Committee.

90.     For the 2022 Fiscal Year, Defendant DeNicola received $35,357 in total compensation from the Company, all of which was in fees earned or paid in cash. For the 2021 Fiscal Year, Defendant DeNicola received $226,383 in total compensation from the Company. This included $116,484 in fees earned or paid in cash and $109,899 in stock awards. For the 2020 Fiscal Year, Defendant DeNicola received $265,000 in total compensation from the Company. This included $160,000 in fees earned or paid in cash and $105,002 in stock awards.

91.     Upon information and belief, Defendant DeNicola is a citizen of Texas.

92.     The 2022 Proxy Statement stated the following about Defendant DeNicola:

Mr. DeNicola is retired. He served as Chief Financial Officer of KIOR, Inc., a biofuels company, from November 2009 to January 2011. He was Senior Vice President and Chief Financial Officer of KBR, Inc., a global engineering,

construction and services company, from June 2008 until October 2009. From June 2002 to January 2008, he was Senior Vice President and Chief Financial Officer of Lyondell Chemical Company, a global manufacturer of basic chemicals. DeNicola also served as Senior Vice President and Chief Financial Officer of Equistar Chemicals, LP and Millennium Chemicals Inc., both subsidiaries of Lyondell Chemical Company, from June 2002 to January 2008. He was also a director of Axiall Corporation (formerly Georgia Gulf Corporation) from September 2009 to August 2016.

**Relevant Non-Parties**

93.     The Securities Class Action captioned *David Ramos v. Comerica Bank et al*, 2:23-CV-06843 in the U.S. District Court, Central District of California (Los Angeles) interviewed a series of Confidential Witnesses who worked at the Company or its vendors throughout the Relevant Period and had intimate knowledge regarding the misconduct at issue.

*CW1*

94.     CW1 was the VP of Global Product Management – Card Issuing at i2c from December 2021 to April 2022. CW1 worked at i2c's headquarters in Redwood City, California and reported directly to i2c President Jim McCarthy.

*CW2*

95.     CW2 worked as an AVP Business Continuity Consultant at Comerica from March 2013 to March 2018 and as a VP – Risk Analyst at Comerica Bank from April 2018 to November 2021. CW2 worked primarily at Comerica Bank's offices in Auburn Hills, Michigan and reported to Dawn Sawka, who was in charge of cybersecurity risk of third-

party vendors. CW2 worked on Business Continuity and Disaster Recovery plans for third-party vendors.

**CW3**

96.    CW3 worked at Comerica's Auburn Hills office from September 2012 to September 2021 as first (1) an Information Security Senior Risk Analyst – Vice President from September 2012 to September 2016; (2) as Information Security Risk Expert – Vice President from September 2016 to March 2018; and (3) as a Cybersecurity Risk Senior Manager – Risk Management and Third-Party Risk Management from March 2018 to September 2021.

**CW4**

97.    CW4 worked at i2c from August 2018 to October 2023. In i2c's Omaha, Nebraska call-center, CW4 worked as a Customer Services Representative from August 2018 to September 2020 and as a Chargeback Analyst from September 2020 to October 2023. CW4 was responsible for answering calls from Direct Express cardholders inquiring about their charges and balances. CW4 processed paperwork regarding fraud complaints.

**CW5**

98.    CW5 in i2c's Omaha, Nebraska callback center from March 2020 to March 2023. While there, CW5 worked as a Customer Service Representative from March 2020 to July 2020, Chargeback Analyst and Financial Operations Analyst from July 2020 to July 2022, and as a Senior Chargeback Analyst and Financial Operations Analyst from July

2022 to March 2023. CW5 handled calls from Direct Express customers and processed fraud claims.

**CW6**

99.   CW6 worked for i2c as a Chargeback Analyst between May 2021 to September 2022 at the company's San Antonio, Texas, call center. CW6 reported to a supervisor named Von, Von reported to Kinsi Tracy, a Chargeback Manager in the Omaha call center, and Kinsi reported to Sean Wint, the Global Head of Fraud Operations at i2c.

**CW7**

100.   CW7 worked remotely for i2c from October 2019 to October 2021. During this time, CW7 worked as a Customer Service Representative from October 2019 to March 2020 and as a Chargeback Analyst from March 2020 to October 2021. CW7 reported to Kinsi Tracy, a Chargeback Manager in i2c's Omaha call center. CW7's responsibilities included handling cardholder dispute cases and to determine whether a cardholder was due a credit for a transaction.

**CW8**

101.   CW8 worked at i2c from August to December 2020 as the Manager of Fraud and Chargeback Operations. CW8 reported directly to Global Head of Chargebacks Angie Anderson. CW8 would train new employees in process dispute and chargeback procedures.

**CW9**

102.   CW9 worked at i2c from August 2018 to August 2021 in the Omaha call center.  CW9 first worked as a customer Service Manager from August 2018 until either

late 2020 or early 2021, until CW9 ultimately served as interim Head of Global Chargebacks until the end of CW9's tenure. As manager, CW9 oversaw customer service representatives in the Omaha call center, many of whom took incoming calls from Direct Express cardholders. While the interim Head of Global Chargebacks, CW9 oversaw the dispute processing and chargeback employees in Omaha.

### CW10

103.    CW10 worked at Conduent in the Customer Advocacy Group from June 2021 to July 2022 in the San Antonio office. While there, CW10 reported to Senior Supervisor Veronica McCray. Prior to joining Conduent, CW10 worked at i2c in the San Antonio office as an Escalation Specialist and reported to Ann Graham. At Conduent, CW10 investigated complaints of Direct Express cardholders who complained of fraud. At i2c, CW10 assisted cardholders who needed their claims with i2c elevated beyond lower-level service representatives.

### **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

104.    By reason of their positions as officers, directors, and/or fiduciaries of Comerica and because of their ability to control the business and corporate affairs of Comerica, the Individual Defendants owed Comerica and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Comerica in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Comerica and its shareholders so as to benefit all shareholders equally.

105.   Each director and officer of the Company owes to Comerica and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

106.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Comerica, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

107.   To discharge their duties, the officers and directors of Comerica were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

108.   Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Comerica, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been

ratified by the remaining Individual Defendants who collectively comprised Comerica's Board at all relevant times.

109.  As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

110.  To discharge their duties, the officers and directors of Comerica were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Comerica were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Comerica's own Code of Ethics and Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Comerica conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, such as misrepresenting the Company's compliance with its Federal Contract and Regulation E, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Comerica and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Comerica's operations would comply with all applicable laws and Comerica's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

Verified Shareholder Derivative Complaint

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

111.   Each of the Individual Defendants further owed to Comerica and the shareholders the duty of loyalty requiring that each favor Comerica's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

112.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Comerica and were at all times acting within the course and scope of such agency.

113.   Because of their advisory, executive, managerial, and directorial positions with Comerica, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

114.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Comerica.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

115.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

116.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

117.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of Comerica was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

118.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

119.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Comerica and was at all times acting within the course and scope of such agency.

## COMERICA'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Code of Conduct*

120.   The introduction to Comerica's Code of Business Conduct and Ethics ("Code of Conduct") reads, in relevant part: "Our Code of [Conduct] for ***Employees is the most important document at Comerica***. It is the foundation on which all of our business practices at Comerica are constructed[.]"

121.   Additionally, Defendant Farmer stated in a message preceding the Code of Conduct, "***In the final analysis, at Comerica each of us is personally accountable for reading and understanding the Code of Business Conduct and Ethics for Employees***, thinking about the principles on which is it constructed, and then incorporating those principles into our lives."

122.   The Code of Conduct states in a section titled "Ethical Business Practices":
- ***We should conduct our business in accordance with all material applicable laws, rules and regulations.***
- We should maintain the highest standards of ethical business conduct and integrity by:

> ➤ Being fair and honest in all business dealings, including our professional relationships;
> ➤ Properly maintaining all information and records, recognizing errors and, when an error is confirmed, promptly correcting it; and
> ➤ Cooperating fully with all internal and external audits and investigations initiated or sanctioned by Comerica.

- We must protect the confidentiality and privacy of confidential customer, shareholder, proprietary and third-party information and records.
- We must make business decisions that align with Comerica's risk appetite, are in the best interests of Comerica and without regard to personal gain. This means that we should use good judgment and endeavor to avoid even the appearance of any conflict between our individual interests and those of Comerica.

123. Regarding "Dealing Fairly with Others and Maintaining Professional Relationships," the Code of Conduct states:

(a) To maintain an effective working environment, we must treat our clients, coworkers and business partners with fairness and respect, and we must maintain the highest standards of personal integrity.

(b) We are committed to providing all employees with a workplace free of conduct that may be considered harassing, abusive, and we will not unlawfully discriminate against anyone.

   • We will not tolerate unlawful harassment in any form.
   • To maximize our effectiveness as an organization, we must promote equal opportunity and diversity. We must not unlawfully discriminate against others.

(c) We should deal fairly with customers, suppliers, competitors, and colleagues, and *should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential or privileged information, misrepresentation of material facts, or any other unfair-dealing practice.*

(d) Understanding that we represent Comerica at all times, we should strive to conduct our personal affairs, including our financial affairs, in a responsible and prudent manner.

124.   The Code of Conduct states in a section titled "being Fair and Honest in All Business Dealings" that "We are expected to be fair, to act with honesty and to maintain the highest standards of personal integrity with one another and in all business dealings."

125.   Regarding "Avoiding Conflicts of Interest," the Code of Conduct states:

(a) A conflict of interest generally refers to a situation where your personal interest interferes or reasonably appears to interfere with the interests of Comerica as a whole. Relevant personal interests may be of a financial or non-financial nature and may concern a personal or family relationship or professional affiliation.

(b) Keep in mind that reasonably perceived conflicts of interest should be avoided, since perceptions can impact Comerica's reputation by raising doubts about decisions that are made. The reasonable appearance of a conflict of interest can constitute a reputational risk to the company, even if it turns out to be unsubstantiated.

(c) Depending on the situation, board or fiduciary appointments, secondary employment, relatives working at Comerica, or other relevant relationships/activities could constitute a conflict of interest.

126.   Regarding "Respecting Confidentiality of Information," Code of Conduct states, in relevant part:

To keep the trust of our customers, we must maintain the confidentiality of the information they provide to us or that we develop or collect about our customers and must honor their reasonable expectations of privacy, including sharing information internally. Material, non- public customer information should only be disclosed internally on a "need to know" basis and only with our colleague's understanding of the need to maintain confidentiality.

127.   Regarding "Risk Management," the Code of Conduct adds that:

Risk Management is a critical component of Comerica's corporate strategy, which reinforces its importance. We recognize that nearly every action Comerica takes as a financial intermediary requires some degree of risk. Our

corporate culture is not to eliminate risk, but to understand and manage our risks, as well as receive appropriate compensation for accepting such risks. Current and planned actions of colleagues must be reflective of Comerica's risk appetite and risk limits, which are guided by Comerica's conservative culture. We are committed to take into consideration the levels of risk acceptable to the organization in regard to business opportunities and day-to-day activities. As an employee, you are responsible for understanding Comerica's Risk Appetite Statement, as it identifies the level of risk that is acceptable, and for following the policies and procedures in place to help identify, mitigate and manage risk effectively.

128.   Comerica's Code of Conduct expressly prohibits insider trading and states, "To protect our shareholders and comply with the requirements of regulators, *we must hold* *"inside information" in confidence and not misuse it*."

129.   Additionally, the Code of Conduct stipulates that "Any violations of this Code of Business Conduct and Ethics for Employees, or any other Comerica policy, *may* *constitute grounds for corrective action, up to and including immediate termination of* *employment or engagement*, at Comerica's sole discretion."

*Director's Code of Conduct*

130.   The Company also maintains a Code of Business Conduct and Ethics for Members of the Board of Directors (the "Director's Code of Conduct"). The purpose of the Director's Code of Conduct is to provide "guidance for [Directors] with respect to recognizing and handling ethical issues, as well as to provide information on how to manage unethical conduct and to assist in fostering a culture of openness and accountability[.]"

131.   The Director's Code of Conduct applies "to all Directors" and "[a]ny Director who also serves as an officer of Comerica should read and comply with this Code[.]"

132.   Regarding "Compliance with Laws," the Director's Code of Conduct states:

It is Comerica's policy and practice to comply with all material applicable laws, rules and regulations. Directors should adhere, and cause Comerica to adhere, to the standards and restrictions imposed by those laws, rules and regulations in carrying out their responsibilities to Comerica.

It is both illegal and against Comerica's policy for any Director to buy or sell securities of Comerica while in possession of material non-public information about Comerica or to pass such information on directly or indirectly to others who engage in such transactions. In order to avoid any violations of such laws or Comerica policy, Directors should comply with Comerica's Insider Trading Policy and Disclosure Policy.

It is also both illegal and against Comerica's policy for any Director who possesses material non-public information about any of Comerica's clients or any other company doing business with Comerica to buy or sell that company's securities or to pass that information on directly or indirectly to others who engage in such transactions.

Any Director who is unsure about the legal consequences of any purchase or sale of a security of Comerica, or of any company the Director is familiar with by virtue of his or her position with Comerica, should consult with Comerica's Insider Trading Policy and the Head of Corporate Legal before engaging in the transaction.

133.   For "Reporting Illegal/Unethical Behavior," the Director's Code of Conduct states:

 Directors should promote ethical behavior and an environment in which Comerica:
      • encourages employees to communicate openly with supervisors, managers and other appropriate personnel about observed illegal or unethical behavior and, when in doubt, about the best course of action in a particular situation;

• encourages employees to report violations of laws, rules, regulations or Comerica's Code of Business Conduct and Ethics for Employees to appropriate personnel; and

• communicates that there will be no disciplinary action or retaliation of any kind taken or tolerated by Comerica as a result of an employee reporting in good faith a potential conflict of interest in another employee's activities or a suspected violation of law, rule, regulation, or provision of Comerica's Code of Business Conduct and Ethics for Employees.

The Governance, Compensation and Nominating Committee shall take all action it considers appropriate to investigate or direct the investigation of any alleged violations of this Code that have been reported to the Chairman of the Governance, Compensation and Nominating Committee or the Chairman of the Board. If a violation has occurred, Comerica, after consultation with the Governance, Compensation and Nominating Committee, will take such disciplinary or preventive action as it deems appropriate.

### *Corporate Governance Guidelines*

134.   Comerica maintains "Corporate Governance Guidelines" to define the Board's responsibilities and duties regarding oversight. The Corporate Governance Guidelines explain that the Board's primary duty "is the oversight of Comerica's management team, which is under the direction of the [CEO]."

135.   The Corporate Governance Guidelines state that "[t]he basic responsibility of the Directors is to exercise their business judgment in good faith and to act in what they reasonably believe to be in the best interests of Comerica."

136.   In a section titled "Director Access to Officers and Employees," the Corporate Governance Guidelines state:

Directors have full and free access to officers and employees of Comerica. Any meetings or contacts that a Director wishes to initiate may be arranged

through the CEO, the Corporate Secretary, or directly by the Director. The Directors will use their judgment to ensure that any such contact is not disruptive to the business operations of Comerica and will, to the extent not inappropriate, copy the CEO on any written communications between a Director and an officer or employee of Comerica.

The Board welcomes regular attendance at each Board meeting of the appropriate representatives of senior management of Comerica as shall be determined from time to time, subject to the Board's right in all instances to meet in executive session or with a more limited number of management representatives.

137.   The Corporate Governance Guidelines state the following in a section titled "Procedure for Handling Complaints regarding Accounting or Auditing Matters":

The Audit Committee is responsible for establishing procedures for the receipt, retention and treatment of complaints received by Comerica regarding accounting, internal accounting controls, or auditing matters and for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. The Board believes that the establishment of formal procedures for receiving and handling complaints should serve to facilitate disclosures, encourage proper individual conduct and alert the Audit Committee to potential problems before they have serious consequences.

138.   Regarding, the "Code of Business Conduct and Ethics for Employees," the Corporate Governance Guidelines state:

Comerica strongly believes in fostering a culture of honesty, accountability and integrity. Comerica has adopted a Code of Business Conduct and Ethics for Employees to promote ethical behavior. It addresses, among other things, conflicts of interest, corporate opportunities, confidentiality, fair dealing, protection and proper use of company assets, compliance with laws, rules and regulations and encouraging the reporting of any illegal or unethical behavior. Any waiver of the Code of Business Conduct and Ethics for Employees for an executive officer may be made only by the Board or a Board committee and must be promptly disclosed to the shareholders.

139. Regarding "Code of Ethics for Senior Financial Officers," the Corporate Governance Guidelines state:

> The honesty, integrity and sound judgment of the CEO and senior financial officers is fundamental to the reputation and success of Comerica. Accordingly, in addition to adhering to the previously referenced Code of Business Conduct and Ethics, Comerica's CEO and senior financial officers (the Chief Financial Officer, the Chief Accounting Officer and the Treasurer) are required to adhere to the Senior Financial Officer Code of Ethics. The Senior Financial Officer Code of Ethics is intended to deter wrongdoing and, among other things, to promote (i) honest and ethical conduct; (ii) full, fair, accurate, timely and understandable disclosure; and (iii) compliance with applicable governmental laws, rules and regulations. It is also intended to promote the prompt internal reporting of violations of such code and accountability for adherence to its provisions. Waivers of the Senior Financial Officer Code of Ethics may be made only by the Audit Committee. Any waivers (including implicit waivers) or amendments to the Senior Financial Officer Code of Ethics must be promptly disclosed.

140. Regarding "Code of Business Conduct and Ethics for Members of the Board of Directors," the Corporate Governance Guidelines state:

> Comerica has adopted a comprehensive Code of Business Conduct and Ethics for Members of the Board of Directors, and Directors are expected to act at all times in accordance with its requirements. It addresses, among other things, conflicts of interest, corporate gifts, corporate opportunities, confidentiality, fair dealing, protection and proper use of company assets, compliance with laws, and the reporting of illegal/unethical behavior. Any waiver of the Code of Business Conduct and Ethics for Members of the Board of Directors may be made only by the Governance, Compensation and Nominating Committee or the Board of Directors and must be promptly disclosed to the shareholders.

### *Enterprise Risk Committee Charter*

141. Comerica maintains the "Amended and Restated Charter of the Enterprise Risk Committee of the Board of Directors of Comerica Incorporated" (the "Enterprise Risk

Committee Charter"). The charter defines the "sole purpose" of the Enterprise Risk Committee as "to have the responsibility for the risk-management policies of the Corporation's global operations and oversight of the operation of the Corporation's global risk-management framework."

142. In a section titled "Goals and Responsibilities of the Committee," the charter states:

(a) Oversee the Corporation's risk management framework, which must be commensurate with the Corporation's structure, risk profile, complexity, activities, and size;

(b) Assess and support, as appropriate, the stature and independence of the Corporation's independent risk management;

(c) Review and approve, as needed, policies and procedures establishing risk-management governance, risk-management procedures, and risk-control infrastructure for the Corporation's global operations and, where appropriate, challenge management on the proposed structure of such policies and procedures;

(d) Oversee the development of, and periodically monitor, the Corporation's risk appetite;

(e) Review and approve, at least annually, the Risk Appetite Statement and appropriateness of risk limits;

(f) Oversee the processes and systems for implementing and monitoring compliance with risk-management and risk-control policies and procedures, including:

    1) Processes and systems for identifying and reporting risks and risk-management deficiencies, including regarding emerging risks, and ensuring effective and timely implementation of actions to address emerging risks and risk-management deficiencies for the Corporation's global operations;

2) Processes and systems for establishing managerial and employee responsibility for risk management;

3) Processes and systems for ensuring the independence of the risk-management function;

4) Processes and systems to integrate risk management and associated controls with management goals and the compensation structure for the Corporation's global operations;

(g) At least annually, appoint, or recommend to the Board of Directors the appointment of, a Chief Risk Officer with experience in identifying, assessing, and managing risk exposures of large, complex financial firms. The Chief Risk Officer shall report directly to both the Chief Executive Officer and the Committee, and, in addition to such other duties as may be determined from time to time by the Chief Executive Officer or the Committee, shall be responsible for:

1) Overseeing the establishment of risk limits on an enterprise-wide basis and the monitoring of compliance with such limits;
2) Overseeing the implementation of and ongoing compliance with the policies and procedures establishing risk-management governance, risk-management procedures, and risk-control infrastructure for the Corporation's global operations and the development and implementation of the processes and systems for implementing and monitoring compliance with such policies and procedures;
3) Overseeing the management of risks and risk controls within the parameters of the Corporation's risk control framework, and monitoring and testing of the Corporation's risk controls; and
4) Reporting risk-management deficiencies and emerging risks to the Committee and resolving risk-management deficiencies in a timely manner.

The compensation and other incentives provided to the Chief Risk Offer must be consistent with providing an objective assessment of the risks taken by the Corporation;

(i) Review and approve, at least annually, enterprise risk policies and charters related to capital planning, model risk management, credit risk, asset quality, market risk, technology risk, operational risk, strategic risk, financial reporting risk and compliance risk;

(j) Review and/or approve, at least annually, the Capital Management Policy;

(k) Regularly review and, where appropriate, challenge management on reports from the Enterprise Risk and Return Committee pertaining to credit risk, market risk, liquidity risk, technology risk (including cybersecurity and information security risk), operational risk, strategic risk, financial reporting risk, compliance risk and other general risks to the Corporation and the actions undertaken or to be undertaken to identify, measure, monitor and control such risks;

(l) Periodically review the status of any pending litigation at and above the levels determined by the Committee from time to time;

(m) Review the examination reports of the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of Dallas, the Texas Department of Banking, and/or any other applicable federal or state banking regulatory agency or authority;

(n) Review and/or approve, as appropriate, material, significant policies and programs that are designed to comply with the terms of applicable federal and state banking laws, rules, regulations and guidance (including supervisory letters);

(o) Review and challenge management, as appropriate, on various elements of the capital planning and related stress testing process and on material policies and procedures;

(p) Review and approve the adequacy of significant insurance coverages;

(q) Oversee, receive reports from and advise management on environmental and social risk, including but not limited to, the Corporation's management of risk pertaining to sustainability, climate change, and corporate social responsibility;

(r) direct senior management to provide Committee members with information that is sufficient in scope, detail, and analysis to enable the Committee to make sound, well informed decisions and consider potential risks; and

(s) Review any other matters that may be delegated to the Committee by the Board.

*Audit Committee Charter*

143.   Comerica maintains an "Audit Committee Charter" which defines the roles and scope of the Audit Committee.

144.   Per the Audit Committee Charter, the Audit Committee's primary purpose is to:

(a)   Provide assistance to the Board by overseeing: (i) the integrity of the Corporation's financial statements; (ii) the Corporation's compliance with legal and regulatory requirements; (iii) the outside auditor's qualifications and independence; (iv) the performance of the Corporation's internal audit and credit review functions, and outside auditors, including with respect to both bank and non-bank subsidiaries; and

(b)   Prepare the Committee report as required by the SEC to be included in the Corporation's annual proxy statement.

145.   The Audit Committee Charter charges the Audit Committee with the following responsibilities regarding "Outside Auditors":

(a)   Be directly responsible for the selection, appointment, retention, compensation, evaluation and termination of, as well as the oversight of the work of, any registered public accounting firm employed by the Corporation (including resolution of disagreements between management and the outside auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation, and each such registered public accounting firm shall report directly to the Audit Committee.

(b)   Review, and, if such services are appropriate in the discretion of the Audit Committee, pre-approve (i) all auditing services to be provided by the outside auditor (which may entail providing comfort letters in connection with securities underwritings or statutory audits required for insurance companies for purposes of state law); (ii) all internal control-related services; and (iii) all permitted non-audit services (including tax services) to be provided by the outside auditor, provided that preapproval is not required with respect to non-audit services if (a) the aggregate amount of non-audit services provided to

the Corporation constitutes not more than 5% of the total amount of revenues paid by the Corporation to its auditor during the fiscal year in which the non-audit services are provided; (b) such services were not recognized by the Corporation at the time of the engagement to be non-audit services; and (c) such services are promptly brought to the attention of the Audit Committee and approved prior to the completion of the audit by the Audit Committee or by 1 or more members of the Board to whom authority to grant such approvals have been delegated by the Audit Committee.

\*\*\*

(d)  At least annually, obtain and review a report by the outside auditor describing the following (provided, however, that the outside auditor will not be required to provide any such item to the extent so doing would cause the outside auditor to violate Applicable Laws): the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (to assess the auditor's independence) all relationships between the outside auditor and the Corporation.

\*\*\*

(g)  Review and discuss timely reports from the outside auditor on material written communications between the outside auditor and management, such as any management letter or schedule of unadjusted differences.

\*\*\*

(i)   Discuss with management and the outside auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles.

\*\*\*

(m) Review at least annually with management and the outside auditor their assessments of, and any major issues as to, the adequacy of internal controls, and any special steps adopted in light of material control deficiencies.

146.   Regarding the Audit Committee's "Internal Audit and Asset Quality Review Function," the charter states:

51

Verified Shareholder Derivative Complaint

(o) Review the appointment of the General Auditor, as needed.

(p) At least annually, review with management the role and scope of the work performed by the internal auditors and the asset quality review examiners, approve the risk assessment methodology, the audit and credit review plans, budgeted hours and staffing, and periodically review the plan status and findings.

(q) Periodically assess and support the stature and independence of Internal Audit.

(r) At least annually, review and approve the Charter of the Corporate Internal Audit Department, Charter of the Asset Quality Review Department, the Internal Audit Policy, the Asset Quality Review Policy, and the Code of Business Conduct and Ethics for Employees.

147.   Regarding "Financial Reporting / Internal Controls" the Audit Committee Charter states:

(s) review and discuss the annual audited financial statements and unaudited quarterly financial statements with management and the outside auditor, including the Corporation's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and, if appropriate, approve the same.

(t) Review, discuss and, if appropriate, approve earnings press releases, and discuss financial information and earnings guidance, if any, provided to analysts and rating agencies. These discussions may be done generally….

(u) Quarterly, the Audit Committee will discuss any significant interim financial statement matters with the outside auditor and General Auditor, prior to the filing of the Quarterly Report on Form 10-Q.

(w) Meet with the Chief Executive Officer and the Chief Financial Officer to discuss officer certification issues and (i) all significant deficiencies in the design or operation of internal controls which could adversely affect the Corporation's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls, and (ii) any fraud, whether or not material, that involves

management or other employees who have a significant role in the Corporation's internal controls.

148.   Regarding "Compliance Oversight," the Audit Committee Charter states:

(x) Discuss the guidelines and policies that govern the process by which risk assessment and risk management is undertaken.

(y)Address, as needed, the tasks and responsibilities assigned to the Audit Committee in the Senior Financial Officer Code of Ethics and review and approve such Code.

(z) When appropriate, establish and review procedures for (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

(aa) Receive and review reports, if any, from management regarding Regulation FD (Fair Disclosure).

(bb) Provide an Audit Committee report in the Corporation's annual proxy statement.

(cc)   Under the direction of the Comerica Bank Board, review, and, if appropriate, approve the amounts reported each period for the provision for loan and lease losses and for the allowance for loan and lease losses ("ALLL") and the allowance for credit losses on lending-related commitments.  Oversee and monitor the internal controls over the ALLL determination process. Review and, if appropriate, approve a summary prepared by management of Comerica Bank of the amount to be reported in the financial statements for the ALLL.  Periodically, review the methodology for the ALLL.

149.   The Individual Defendants violated Comerica's Code of Conduct by engaging in or permitting the Company to engage in Direct Express Misconduct, issuing materially false and misleading statements to the investing public, and facilitating and disguising the

Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct and the Director's Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct, the Director's Code of Conduct and the law.

150.   Moreover, the Individuals who served on the Company's Audit Committee and the Enterprise Risk Committee violated the respective charters by engaging in or permitting the Company to engage in the Direct Express Misconduct, issuing materially false and misleading statements to the investing public, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act. In addition the Individual Defendants who served on the Company's Enterprise Risk Committee and the Audit Committee during the Relevant Period violated the respective charters by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company' disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

151.   Comerica is a Delaware corporation headquartered in Texas. Comerica considers California to be a "primary U.S. location," with a major office at 601 South Figueroa Street, Suite 100, Los Angeles, CA 90017. Comerica is an American multinational financial services company that provides banking, investment and mortgage products and services, as well as consumer and commercial finance.

152.   Comerica is the Treasury's financial agent for operating the Direct Express program. The Direct Express program falls under Comerica's Commercial Banking segment.

### Direct Express Misconduct

153.   The Direct Express program was created in 2008 under the Department of Treasury as a means of weaning federal benefit recipients from costly paper checks. In doing so, the federal government contracted with several banks to become issuers of Direct Express pre-paid debit cards that would load the recipients benefits directly onto.

154.   The Direct Express program enables millions of Americans to receive social security, disability, veterans', and other federal benefits electronically. These users register for the program because they do not personally have banking or deposit accounts for their funds to be administered to. Accordingly, users of the Direct Express program tend to include some of the most vulnerable populations in America.

155.   Comerica has been the issuing bank of the Direct Express program since its inception in 2008. The contract for the program was renewed in 2015 and again in 2020. As head of the program, Comerica has received over $415 million.

156.   In administering the Direct Express program, Comerica must comply with the terms of the Federal Contract between it and the government. One such provision is that all operations related to the Direct Express contract **must be in the United States** or an American Territory.

157.   Additionally, the Direct Express program is governed by the Electronic Funds Transfer Act ("EFTA") and the regulatory framework commonly referred to as "Regulation E." These two regulations provide provisions of consumer rights that institutions are expected to comply with. In particular, these provisions provide comprehensive protections for consumers against fraud and places strict expectations on the issuing financial institution in handling any claims of fraud.

158.   In March 2019, the Company submitted its application to the Treasury, Bureau of Fiscal Services to be renewed as the financial agent for the Direct Express program. In its application, the Company said it was partnering with two vendors, Conduent and i2c, to administer the Direct Express program.

159.   The Company assured the Treasury in its application that any customer service personnel it staffed "be a U.S. citizen or lawful permanent resident." Likewise, the Company assured in its application that, in compliance with the security requirements of the Treasury, it was "assigning and employing staff who are documented U.S. citizens or

lawful permanent residents" and "continuously monitor[ing] our partners' security compliance, including SOC reviews, onsite visits, and self-testing."

160. Additionally, the Company explicitly stated in its application that Regulation E "applies to each cardholder account" and that "Comerica assumes all responsibility for Regulation E compliance and any payment liability or loss."

161. Included in the Federal Contract was the following provision:

*Location of Services*. Except as prohibited by law, the Financial Agent is hereby authorized to provide Debit Card services to cardholders within and outside of the United States as necessary to facilitate the use of Debit Cards by cardholders anywhere in the world. *All other services provided under this FAA*, including the development, operation and maintenance of systems and applications performed specifically and exclusively on behalf of the Treasury, *shall be performed in the United States or its territories unless specifically authorized otherwise in writing*. … Except as necessary for benefit payment access, *the Financial Agent will also ensure that all employees with access to systems, applications or other media that exclusively contain Treasury Information are United States citizens or lawful permanent residents unless specifically authorized otherwise in writing*.

162. Included in the Federal Contract was the following provision for "Management of Contractors": The Financial Agent is responsible for the supervision and management of any Contractor retained to assist in the performance of services under this FAA. The Financial Agent shall remove and replace any Contractor that fails to perform satisfactorily."

163. Additionally, the Federal Contract imposes duties to safeguard sensitive information on Comerica, Conduent, and i2c. One such provision reads:

*Financial Agents should safeguard all sensitive information obtained or maintained by the Financial Agent or its employees or Contractors to*

*accomplish Fiscal Service-required services*. In handling sensitive information, ***Financial Agents should, at a minimum, comply with the procedures for the protection of customer information set forth in the Federal banking agencies' "Joint Interagency Guidelines Establishing Information Security Standards,"*** as may be amended from time to time. ***The Financial Agent may disclose sensitive information only to those employees of the Financial Agent who have a legitimate need to know the information to assist in the proper performance of Fiscal Service-required services***. Furthermore, ***any Contractor used by the Financial Agent to provide services under this agreement must agree in writing to the required safeguarding obligations consistent with those of the Financial Agent***.

164.   Effective January 2020, the Company was renewed as the Financial Agent of the Direct Express Program.

165.   In the course of handling the Direct Express program, however, the Company has failed to comply with the terms of the Federal Contract and the federal regulations. A May 29, 2023, article by the *American Banker* entitled "Comerica in 'Serious Violation' of Treasury's Direct Express Program," revealed the litany of longtime issues plaguing the Company's handling of the Direct Express program.

166.   For one, internal documents cited in the article indicate that executives were concerned that the Company "faced a 'serious contract violation' for allowing fraud disputes and data on Direct Express cardholders to be handled out of a vendor's office in Lahore, Pakistan." The internal documents referenced that the Federal Contract had the specific provision that all services provided "shall be performed in the United States or it territories." In direct violation of this, executives were allowing the Direct Express program to be handled in Pakistan.

167.   Additionally, internal records and complaints by customers reveals that the Company was failing to comply with the EFTA and Regulation E by having insufficient fraud prevention and remedy programs. Indeed, one email from 2020 from a Comerica executive described in detail the Company's "sweeping violations of Regulation E." Among the serious concerns, the executive stated:

- "We are having significant difficulty getting adequate fraud reporting."
- We can't get the Call Center statistics we need."
- Reg E adjudication is an issue"
- Fraud prevention is a serious issue"
- Reporting in general is an issue – we aren't getting the reporting that the [Treasury's Bureau of] Fiscal Services requires."

168.   Sources familiar with the bank's compliance management system told the *American Banker* that "in-house lawyers escalated their concerns to the bank's senior leadership, including Susan Joseph, Comerica's head of compliance; Jay Oberg, senior executive vice president and chief risk officer; and Peter L. Sefzik, senior executive vice president and chief banking officer."

### *Confidential Witnesses' Accounts*

169.   The ten confidential witnesses in the Securities Class Action further colored the breadth of the misconduct through their statements.

170.   CW2 reported that the Company had an expansive risk group that had obtained the "schematics" of a third-party vendor's data centers which documented the flow of Comerica Bank's data through the vendor's systems. CW2 confirmed that Nora Arpin was responsible for overseeing the Direct Express program and that the various risk

committees at the company were responsible for reviewing third-party vendor concerns that fall outside of acceptable risks levels. CW2 noted that certain "damage control" issues were eventually handled at the "executive, c-suite level." During CW2's tenure, CW2 had to in the Spring of 2018 help close out a 2015 federal government Matter Requiring Attention (MRA) regarding the Company's lackluster oversight of its third-party vendors. CW2 revealed that Conduent had at least one serious problem during that time that reached executive attention, including monthly site visits by executives. CW2 said that this specific problem involved money deposits not posting to customer's cards and resulted in Comerica seeking an additional vendor to work on the Direct Express program.

171.   CW4 expanded upon their experience at i2c's Omaha call center, where they were responsible for handling cardholder issues in the Direct Express program. CW4 recalled that Omaha employees were training by employees at i2c's Pakistan location. During CW4's tenure, the Company had begun to transition its chargeback operations from the Pakistan to Omaha as a result of pressure and security concerns regarding the Pakistan employees.

172.   CW5 also worked as a Chargeback Analyst in the Omaha office and confirmed that in or about July 2020, i2c's chargeback analysts were still in Pakistan. CW5 was trained by the employees in Pakistan to work as one of the first U.S. chargeback analysts. When CW5 left in 2023, CW5 confirmed that employees in Pakistan were still training chargeback analysts in Omaha. CW5 confirmed that while the U.S. employees

handled the majority of issues, whenever they requested the assistance of a Pakistan employee, the Pakistan office would receive access to the cardholder's account.

173.   Similarly, CW6 confirmed that during CW6's tenure, the i2c employees in Pakistan were still working on Direct Express. In approximately March 2022, just six months prior to CW6's departure, i2c held a meeting and informed chargeback staff it intended to transition another part of the dispute processing work to U.S. employees. At that time, Pakistan employees were still responsible for processing the first step in cardholder disputes, meaning the employees in the Pakistan office were inputting the disputes formally into the system and creating a spreadsheet of all the disputes and fraud claims, including cardholder information. As such, Comerica was transferring confidential and highly sensitive customer data internationally, in conflict with the Federal Contract. Between October 2021 and December 2021, CW6 participated in a special project to re-investigate hundreds of fraud cases handled by Pakistan employees. During this investigation, CW6 noted that the Pakistan employees had marked most of the claims as "non-fraud," but upon review approximately 90% to 95% of the cases actually had real fraud claims.

174.   Moreover, CW10 worked for Conduent in a nine-person Customer Advocacy Group designed to address the increasing number of customer complaints that had been escalated to official channels such as the Attorney General's Office or the Consumer Financial Protection Bureau. CW10 recalled receiving a dozen or more escalating complaints per day and was given approximately three days to complete them. CW10

estimates that they overturned Conduent's earlier decisions denying a customer's fraud allegation between 80% to 90% of the time. The Customer Advocacy Group handled approximately 36 complaints from Comerica per day, and the group was required to promptly investigate and report back to Comerica as to whether the denial of a fraud claim was erroneous. As CW10 puts it, "They definitely know what was going on as far as a high complaint level of high-level complaints. They knew all the complaints they were receiving."

175.   As such, the confidential witnesses' statements reflect the truth revealed in the *America Banker* article. The Company was in direct violation of its Federal Contract by utilizing vendors in Pakistan and was failing to provide sufficient fraud protection required under Regulation E.

176.   Thus, even as these concerns became rampant throughout the Company nothing was being done to address the issues. Worst yet, the Board members and executives failed to disclose these material facts to the investing public and shareholders throughout the course of the Relevant Period.

177.   Thus, in breach of their fiduciary duties, the Individual Defendants named herein caused the Company to engage in the Direct Express Misconduct, failed to bring an action against each other to remedy this misconduct, and failed to correct material misstatements to the public. As a result of the Individual Defendants engaging in the Direct Express Misconduct, the Company is now subject to several consumer class actions and the Securities Class Action in this jurisdiction.

178.   Despites knowing for years that the Company's handling of the Direct Express program was in violation of the Federal Contract and regulations, Comerica failed to remediate the problem or effectively handle rampant fraud claims that was damaging customers. As a result of the Direct Express Misconduct, the Company has been severely damaged, including, *inter alia*, by now being subject to the Securities Class Action and consumer fraud class actions.

**False and Misleading Statements**

***January 21, 2020 Earnings Call***

179.   On January 21, 2020, the Company held an earnings call (the "FY2019 Earnings Call") in which Defendants Farmer and Herzog participated. In conjunction with the earnings call, the Defendants published a slide deck entitled, "Comerica Incorporated Fourth Quarter 2019 and Full-Year 2019 Financial Review" (the "FY2019 Earnings Presentation Slides") which Comerica filed as Exhibit 99.2 to a Form 8-K signed by Comerica's Chief Legal Officer John D. Buchanan (Buchanan") the ("1/21/2020 Form 8-K").

180.   In prepared remarks, Defendant Farmer stated:

Of note, the ***U.S. Treasury recently announced that we will continue to be the exclusive financial intermediary for the Direct Express government benefits card program for another five years. The economics of this program include attractive retail deposits that we continue to grow, and our ability to leverage a third-party platform for processing and servicing***.

181.   Defendant Farmer further stated that "non-interest income growth" was a positive contributor to Comerica's performance referencing the 1/21/2020 Earnings Presentation Slide 5, which stated "***Noninterest income up over 3%.***"

182.   The FY2019 Earnings Presentation stated on Slide 4, "Noninterest income growth led by strong card fees." To which, Defendant Farmer added that "deposit growth was robust" and the "mix of the growth was favorable with over 40% coming from noninterest-bearing deposits." Defendant Farmer further stated during the call, "[a] $10 million increase in non-interest income helped offset the more challenging rate environment."

183.   During the FY2019 Earnings Call, Defendant Herzog stated in his prepared remarks that "***noninterest income increased $10 million***." This was in reference to Slide 11 of the FY2019 Presentation, which stated that "4Q19 Noninterest Income Increased $10MM, over 3%." Defendant Herzog furthered, "***noninterest-bearing deposits increased over 600 million***," in reference to Slide 7 of the FY2019 Earnings Presentation which stated, "+$615MM noninterest-bearing" and "Beneficial Deposit Mix – Commercial Noninterest-bearing 39%." Moreover, Defendant Herzog stated, "***As far as noninterest income, we expect growth of about 1% led by card [] fees***."

184.   In response to an analyst's question about outside processing fee revenue, Defendant Herzog stated, "very specific to the outside processing fees, so we actually do have some good core growth in a number of line items in 2021. ***One of those is card income***. And of course, we have associated outside processing fees with that . . . we just

saw that strong card year, and we will have some outside processing fees associated with that."

### February 5, 2020 Comerica Incorporated Investor Presentation

185.   On February 5, 2020, the Company published on its website the Comerica Incorporated Investor Presentation, which stated "***47% of deposits are noninterest-bearing***" and deposits "***+615MM noninterest-bearing***." It added, "***Beneficial Deposit Mix – Commercial Noninterest bearing 39%.***" Further, it stated "***4Q19 Noninterest Income Increased $10MM over 3%***" and "***Noninterest income growth led by strong card fees***."

### March 9, 2020 Form 8-K

186.   On March 9, 2020, the Company filed a Form 8-K (the "3/9/2020 8-K" with the SEC signed by Buchanan which reiterated an announcement that Defendant Herzog would be presenting on behalf of Comerica at the RBC Capital Markets Financial Institutions Conference the following day on March 10, 2020. Attached as an Exhibit to the 3/9/2020 8-K was Exhibit 99.1, a deck of presentation slides entitled "RBC Capital Markets Financial Institutions Conference" (the "RBC Presentation Deck") The presentation stated "***47% of deposits are noninterest-bearing***" and "***4Q19 Deposits…+615MM noninterest-bearing***." It added, "***Beneficial Deposit Mix – Commercial Noninterest bearing 39%***." Further, it stated "***4Q19 Noninterest Income Increased $10MM over 3%***" and "***Noninterest income growth led by strong card fees***."

187.   The RBC Presentation Deck stated "47% of deposits are noninterest-bearing" and "4Q19 Deposits . . . +$615MM noninterest-bearing." It added, "Beneficial Deposit – Mix Commercial Noninterest bearing 39%."

### *4/21/2020 Earnings Call and Press Release*

188.   On April 21, 2020, the Company issued a press releasee disclosing their financial and operating results for the first quarter of 2020 (the "1Q20 Press Release"). In the press release, Comerica reported a net loss for the first quarter of 2020 of $65 million, based partly on net interest income of $513 million, including $380 million from its Business Bank business segment, and "stable" noninterest income of $237 million, with $59 million attributed to card fees, including $127 million from its Business Bank business segment. The press release quoted Defendant Farmer, who stated, "Our first quarter results reflect a large increase in our credit reserves and, to a much lesser degree, the net impact of the decline in interest rates."

189.   On April 21, 2020, the Company held another earnings conference call with investors hosted by Defendants Farmer and Herzog (the "1Q20 Earnings Call"). In connection, the Defendants published slides entitled "Comerica Incorporated First Quarter 2020 Financial Review" (the "1Q20 Slide Deck") which was filed as Exhibit 99.2 to a Form 8-K filed that same day.

190.   During the 1Q20 Earnings Call, Defendant Farmer stated: "Following strong seasonal deposit growth in the fourth quarter, average deposit levels remained relatively stable. After the typical decline in January, deposits increased throughout the quarter.

Relative to the first quarter last year, average deposits were up $2.8 billion or 5%," which was a reference to Slide 4 on the 4/21/2020 Earnings Presentation. This slide stated, "Key Performance Drivers 1Q20 compared to 4Q19 – *Deposits relatively stable*."

191.   In prepared remarks, Defendant Herzog stated, "*Average [deposit] balances were relatively stable . . .* Typically, deposits decline in the first quarter. In fact, first quarter deposits in each of the last four years have declined $1.5 billion or more. Defendant Herzog referenced Slide 6 of the 1Q20 Slide Deck, which stated, "*Average deposits relatively stable.*" Defendant Herzog further stated, "*We expect non-interest income to benefit from an increase in card fees with higher transaction volume* as customers receive the government stimulus funds." In addition, Defendant Herzog said, "We have ample access to multiple funding sources, *with 75% of our funding coming from relationship-oriented deposits, of which nearly half are noninterest-bearing deposits*."

192.   In response to an analyst's question about how the stimulus package would impact the Direct Express program, Defendant Herzog said, "*Regarding Direct Express, in my remarks, you might recall that I mentioned that we expect card fees actually to be up in the second quarter*. So, stimulus payments being processed is a component of that. So, we have factored that in."

*Q1 2020 10-Q*

193.   On April 29, 2020, the Company filed with the SEC its Form 10-Q for the period ending March 31, 2020 (the "1Q20 10-Q"). Attached to the 3Q20 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants

Farmer and Herzog. The 1Q20 10-Q stated, under the heading "Outlook for Second Quarter 2020 Compared to First Quarter 2020," that "***Stable noninterest income with increase in card fees.***"

194.   The 1Q20 10-Q included, by reference to the Form 10-K the Company filed with the SEC February 11, 2020 (the "2019 10-K"), the following operational risk:

> **Comerica's operational or security systems or infrastructure, or those of third parties, could fail or be breached, which could disrupt Comerica's business and adversely impact Comerica's results of operations, liquidity and financial condition, as well as cause legal or reputational harm.**
>
> The potential for operational risk exposure exists throughout Comerica's business and, as a result of its interactions with, and reliance on, third parties, is not limited to Comerica's own internal operational functions. Comerica's operations rely on the secure processing, storage and transmission of confidential and other information on its technology systems and networks. These networks are subject to infrastructure failures, ongoing system maintenance and upgrades and planned network outages. The increased use of mobile and cloud technologies can heighten these and other operational risks. Any failure, interruption or breach in security of these systems could result in failures or disruptions in Comerica's customer relationship management, general ledger, deposit, loan and other systems.
> Comerica relies on its employees and third parties in its day-to-day and ongoing operations, who may, as a result of human error, misconduct, malfeasance or failure, or breach of Comerica's or of third-party systems or infrastructure, expose Comerica to risk. For example, Comerica's ability to conduct business may be adversely affected by any significant disruptions to Comerica or to third parties with whom Comerica interacts or upon whom it relies. Although Comerica

195.   The 1Q20 10-Q also included by reference to the 2019 10-K the following operational risk related to vendors:

**Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**

Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk. In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

196.   These operational risks were materially false and/or misleading because at the time that the Company provided these general disclosures, the Company was already experiencing tangible harm from the improper conduct of their third-party vendors, such as i2c. Accordingly, providing these disclosures as a general risk, rather than addressing the specific risks that i2c's lackluster fraud prevention processes posed to the Company's business and reputation, was false and misleading.

### *May 13, 2020 Form 8-K and Investor Presentation*

197.   On May 13, 2020, the Company filed with the SEC a Form 8-K (the "5/13/2020 Form 8-K") signed by Defendant Herzog and attached as Exhibit 99.1 were presentation slides entitled "Comerica Incorporated Investor Presentation" dated May 13, 2020 (the "5/13/2020 Investor Presentation"), which stated, "Key Performance Drivers

1Q20 compared to 4Q19 . . . *Deposits relatively stable."* Further, the Presentation slides stated "Average deposits relatively stable" and "Beneficial Deposit Mix – Commercial Noninterest-bearing 39%."

### June 8, 2020 Form 8-K and Morgan Stanley Conference Presentation

198.   On June 8, 2020, the Company filed with the SEC a Form 8-K (the "6/8/2020 Form 8-K") signed by Defendant Herzog announcing that Defendant Herzog and Melinda A. Chausse, Executive Vice President and Chief Credit Officer, would present on behalf of the Company at the Morgan Stanley Virtual US Financials Conference on June 9, 2020.

199.   Attached to the Form 8-K as Exhibit 99.1 were slides entitled "Morgan Stanley Virtual US Conference" (the "Morgan Stanley Presentation"), which stated "2Q20 Update: Average Deposits Increase $6.1B" and "QTD average deposits reflect increases: +$4.9B noninterest-bearing deposits" and "Outlook for 2Q20 average deposits: [approximately] $63B+." It also noted that "Average deposits [were] relatively stable."

### July 21, 2020 Press Release and Earnings Call

200.   On July 21, 2020, the Company issued a press release announcing its second quarter 2020 earnings results. The press release quoted Defendant Farmer, stating "*The highlight of the quarter was significant loan and deposit growth, which drove average balances to record highs and partly offset the impact of lower interest rates on net interest income*."

201.   Additionally, the press release reported that "*Deposits increased $7.5 billion, or 13 percent, to $64.3 billion*" and represented that the Company experienced "*Growth*

*in nearly every business line, including an increase of $5.9 billion in noninterest-bearing deposits[.]*" The press release also reported that "*noninterest income increased $10 million to $247 million*" and "*reflected increases on $9 million in card fees . . ..*"

202.   Under the heading "Second Quarter 2020 Compared to Second Quarter 2019 Overview," the press release stated, "*Deposits increased $9.3 billion, or 17 percent*" and "*included $6.3 billion, or 24 percent, increased in noninterest-bearing deposits.*"

203.   That same day, the Company held an earnings conference call with investors (the "2Q20 Earnings Call") hosted by Defendants Farmer and Herzog. Alongside the earnings call, the Company filed a Form 8-K with a presentation for the earnings call attached as an exhibit (the "2Q20 Presentation"). In his prepared remarks, Defendant Farmer stated, the "*highlight of the quarter was very strong . . . deposit growth.*" Defendant Farmer furthered, "*With regard to noninterest income, we saw growth of 4% quarter-over-quarter with our strong card franchise being a major contributor.*"

204.   During the same call, Defendant Herzog stated in his prepared remarks that "non-interest income increased $10 million as outlined in Slide 12." He furthered, "*Card fees were very strong and increased $9 million.*" Likewise, Defendant Herzog emphasized the Company had a "*large proportion of noninterest bearing deposits.*"

205.   Defendant Farmer stated in response to an analyst's question regarding lower expenses, "*Another key differentiator would be the outside processing cost that associate with our improved card fees for the quarter. So we did have some very good performance in card non-interest income.*"

206.   In connection with the earnings call, the 2Q20 Presentation reflected that "Key Performance Drivers 2Q20 compared to 1Q20" was "deposit growth" driven "primarily [by] noninterest-bearing" deposits in addition to "noninterest income included higher card fees." The presentation added that "Deposits Grew 13% to Record Level" and that "***Average deposits increase[d]***" from "***$7.5B [to] +$5.9B non-interest bearing***." Additionally, the presentation included "Management Outlook 3Q20 expectation," noting "***Average Deposits – Relatively stable***," "***Noninterest Income – Higher service charges on deposits as activity increase, More than offset by reduced activity (card)***."

### 2Q20 10-Q

207.   On July 31, 2020, the Company filed with the SEC its Form 10-Q for the period ended June 30, 2020 (the "2Q20 10-Q"). Attached to the 2Q20 10-Q were SOX certifications signed by Defendants Farmer and Herzog attesting to the financial accuracy of the reports.

208.   The 2Q20 10-Q reported a net income of $133 million for the period, partly based on net interest income of $471 million, including $402 million from its Commercial Bank business segment and noninterest income of $247 million, with $68 million attributed to card fees, including $144 million from its Commercial Bank business segment.  The 2Q20 10-Q stated that Comerica's $144 million in noninterest income for the Commercial Bank was attributable in part to $59 million in card fees for the quarter, up $5 million from the second quarter of 2019. The 2Q20 10-Q explained:

Net interest income for each segment reflects the interest income generated by earning assets less interest expense on interest-bearing liabilities plus the net impact from associated internal funds transfer pricing (FTP). The FTP methodology allocates credits to each business segment for deposits and other funds provided as well as charges for loans and other assets being funded.

209.   2Q20 10-Q included, by reference 2019 10-K the following operational risk:

**Comerica's operational or security systems or infrastructure, or those of third parties, could fail or be breached, which could disrupt Comerica's business and adversely impact Comerica's results of operations, liquidity and financial condition, as well as cause legal or reputational harm.**

The potential for operational risk exposure exists throughout Comerica's business and, as a result of its interactions with, and reliance on, third parties, is not limited to Comerica's own internal operational functions. Comerica's operations rely on the secure processing, storage and transmission of confidential and other information on its technology systems and networks. These networks are subject to infrastructure failures, ongoing system maintenance and upgrades and planned network outages. The increased use of mobile and cloud technologies can heighten these and other operational risks. Any failure, interruption or breach in security of these systems could result in failures or disruptions in Comerica's customer relationship management, general ledger, deposit, loan and other systems.

Comerica relies on its employees and third parties in its day-to-day and ongoing operations, who may, as a result of human error, misconduct, malfeasance or failure, or breach of Comerica's or of third-party systems or infrastructure, expose Comerica to risk. For example, Comerica's ability to conduct business may be adversely affected by any significant disruptions to Comerica or to third parties with whom Comerica interacts or upon whom it relies. Although Comerica

210.   The 2Q20 10-Q also included by reference to the 2019 10-K the following operational risk related to vendors:

**Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**

Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk. In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

211.    These operational risks were materially false and/or misleading because at the time that the Company provided these general disclosures, the Company was already experiencing tangible harm from the improper conduct of their third-party vendors, such as i2c. Accordingly, providing these disclosures as a general risk, rather than addressing the specific risks that i2c's lackluster fraud prevention processes posed to the Company's business and reputation, was false and misleading.

### August 13, 2020 Investor Presentation

212.    On August 13, 2020, the Company published on its website the "Comerica Incorporated Investor Presentation." The Comerica Incorporated Investor Presentation stated in a slide titled "**2Q20 Earnings Summary" that "Noninterest Income up 4.2% Higher Card Fees**," and "**Deposits Grew $7.5B – Noninterest-bearing deposits up $5.9B**." Further, the presentation reflected that "**Deposit growth primarily non-interest**

*bearing*" and "noninterest income included higher card fees" were "Key Performance Drivers" for 2Q20 compared to 1Q20.

### October 20, 2020 Earnings Call

213.   On October 20, 2020, the Company held an earnings call (the "3Q20 Earnings Call") in which both Defendant Farmer and Defendant Herzog participated. In his prepared remarks, Defendant Farmer stated, "Deposits continue to show strong broad-based growth with *average balances increasing $4.5 billion including $3.2 billion in noninterest-bearing deposits*." Defendant Farmer furthered, "Non-interest income increased as customer activity began to rebound including *continued strong contribution from our card platform*."

214.   In his prepared remarks, Defendant Herzog stated, "***Deposits increased 7%, or $4.5 billion, to a new record of $68.8 billion***." Defendant Herzog furthered, that Comerica's "***large proportion of noninterest-bearing deposits***" were part of what "drove [the Company's] total funding costs to only 14 basis points for the quarter." In addition, Defendant Herzog stated, "***Noninterest income increased $5 million.***" Defendant Herzog noted that "improved economic conditions had a positive impact on . . . card fees . . .[.] Also cad fees remained very strong *and increased $3 million due to higher consumer volumes and merchant activity*, spurred by . . . changes in customer behavior related to COVID."

### 3Q20 10-Q

215.   On October 30, 2020, the Company filed with the SEC its Form 10-Q for the period ended September 30, 2020 (the "3Q20 10-Q"). Attached to the 3Q20 10-Q were SOX certifications signed by Defendants Farmer and Herzog. The 3Q20 10-Q stated, "***Average deposits increased $1.9 billion, reflecting increases in all deposit categories***."

216.   3Q20 10-Q included, by reference 2019 10-K the following operational risk:

**Comerica's operational or security systems or infrastructure, or those of third parties, could fail or be breached, which could disrupt Comerica's business and adversely impact Comerica's results of operations, liquidity and financial condition, as well as cause legal or reputational harm.**

The potential for operational risk exposure exists throughout Comerica's business and, as a result of its interactions with, and reliance on, third parties, is not limited to Comerica's own internal operational functions. Comerica's operations rely on the secure processing, storage and transmission of confidential and other information on its technology systems and networks. These networks are subject to infrastructure failures, ongoing system maintenance and upgrades and planned network outages. The increased use of mobile and cloud technologies can heighten these and other operational risks. Any failure, interruption or breach in security of these systems could result in failures or disruptions in Comerica's customer relationship management, general ledger, deposit, loan and other systems.

Comerica relies on its employees and third parties in its day-to-day and ongoing operations, who may, as a result of human error, misconduct, malfeasance or failure, or breach of Comerica's or of third-party systems or infrastructure, expose Comerica to risk. For example, Comerica's ability to conduct business may be adversely affected by any significant disruptions to Comerica or to third parties with whom Comerica interacts or upon whom it relies. Although Comerica

217.   The 3Q20 10-Q also included by reference to the 2019 10-K the following operational risk related to vendors:

**Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**

Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk. In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

218.   These operational risks were materially false and/or misleading because at the time that the Company provided these general disclosures, the Company was already experiencing tangible harm from the improper conduct of their third-party vendors, such as i2c. Accordingly, providing these disclosures as a general risk, rather than addressing the specific risks that i2c's lackluster fraud prevention processes posed to the Company's business and reputation, was false and misleading.

### *January 19, 2021 Press Release and Conference Call*

219.   On January 19, 2021, the Company issued a press release announcing the fourth quarter and full-year results for fiscal year 2020 (the "FY2020 Press Release"). The press release quoted Defendant Farmer, stating "***Our 2020 results included solid loan***

*performances and a record level of deposit*" and that in the fourth quarter "*deposits increased nearly $1.5 billion*."

220. The press release further stated that "deposits increased $9.6 billion, or 17 percent, to 65.0 billion" and there was "growth in every business line, *including an increase of $6.4 billion in noninterest-bearing deposits*" and also a "$13 million increase in card fees."

221. On that same date, the Company hosted an earnings conference call (the "FY2020 Earnings Call") on which Defendant Farmer and Defendant Herzog provided prepared remarks. In his prepared remarks, Defendant Farmer stated, "*Average deposits increased by nearly $1.5 billion to an all-time high, with 55% of the growth derived from noninterest-bearing accounts.*" Defendant Farmer furthered, "*non-interest income increased $13 million or 5%, as customer activity continued to rebound.*" Further, Defendant Farmer stated, "*Timing of monthly benefit activity in our government prepaid card business increased balances by $2.2 billion at quarter end.*"

222. In Defendant Herzog's prepared remarks, he stated that "card fees remained very strong due to government card and merchant activity spurred by . . . changes in customer behavior related to the COVID environment." Defendant Herzog stated, "*Average deposits increased 2% or $1.5 billion to a new record of $70.2 billion*." Regarding non-interest income, Defendant Herzog stated it "increased $13 million . . . continuing the positive trend we've seen since post the shutdown of the economy earlier

last year." Defendant Herzog stated, "*we expect non-interest income in the first quarter to benefit from higher deposit service charges, fiduciary and brokerage fees*."

*2020 10-K*

223.   On February 9, 2021, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Farmer, Herzog, Collins, Cregg, DeNicola, Kane, Lindner, Taubman, Turner, Vaca, and Van de Ven. Attached to the 2020 10-K were SOX certifications signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

224.   The 2020 10-K stated, "*Average deposits increased $9.6 billion, or 17 percent, to a record level of $65.0 billion*," and that "*Average noninterest-bearing deposits increased $6.4 billion, or 24 percent*." Further, the 2020 10-K stated, "Average deposits increased $7.6 billion, reflecting increases in all deposit categories" in 2020 as compared to 2019. In addition, it stated "*Card fees increased $13 million, or 5 percent*" in 2020 as compared to in 2019.

225.   Included in the 2020 10-K was the following disclosure discussing the Company's reliance on vendors for key components of its banking system:

**Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**

Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. ***While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk.*** In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

226.   The 2020 10-K was materially false and misleading because at the time the Company had issued the 2020 10-K and this disclosure, the Company was aware that its vendor i2c routinely handled the personal identifiable information of Direct Express customers in its office in Lahore, Pakistan, which was in violation of the Federal Contract that required the operations of the Direct Express program to be conducted within the United States or its territories.

227.   Additionally, the 2020 10-K included a disclosure regarding fraud that stated:

**Comerica may incur losses due to fraud.**
Fraudulent activity can take many forms and has escalated as more tools for accessing financial services emerge, such as real-time payments. Fraud schemes are broad and continuously evolving.  Examples include but are not limited to: debit card/credit card fraud, check fraud, mechanical devices attached to ATM machines, social engineering and phishing attacks to obtain personal information, impersonation of our clients through the use of falsified or stolen credentials, employee fraud, information theft and other malfeasance. Increased deployment of technologies, such as chip card technology, defray and reduce aspects of fraud; however, criminals are turning to other sources to steal personally identifiable information in order to

impersonate the consumer to commit fraud. Many of these data compromises have been widely reported in the media. Further, as a result of the increased sophistication of fraud activity, Comerica continues to invest in systems, resources, and controls to detect and prevent fraud. This will result in continued ongoing investments in the future.

228.   The 2020 10-K was materially false and misleading because this disclosure discussed fraud only in general terms, rather than explicitly addressing the existent issues of fraud the Company was experiencing in the Direct Express program. At the time of the 2020 10-K filing, Company executives had already raised internal concerns that the Company was in violation of Regulation E for insufficient fraud prevention and responses in connection with the Direct Express program.

229.   Additionally, the 2020 10-K included a disclosure regarding reputational risks to the Company, which stated:

**Damage to Comerica's reputation could damage its businesses.**
Reputational risk is an increasing concern for businesses as customers are interested in doing business with companies they admire and trust. Such risks include compliance issues, operational challenges, or a strategic, high profile event. Comerica's business is based on the trust of its customers, communities, and entire value chain, which makes managing reputational risk extremely important.  News or other publicity that impairs Comerica's reputation, or the reputation of the financial services industry generally, can therefore cause significant harm to Comerica's business and prospects. Further, adverse publicity or negative information posted on social media websites regarding Comerica, whether or not true, may result in harm to Comerica's prospects.

230.   The 2020 10-K was materially false and misleading because this disclosure discussed the Company's reputational risks in general terms and failed to disclose that heightened reputational risk the Company was experiencing as a result of its

noncompliance with the Federal Contract by utilizing an international vendor to handle its Direct Express program accounts.

231.   Further, the 2020 10-K stated under the heading "Full-year 2020 Compared to Full-Year 2019," that "***Average deposits increased $9.6 billion, or 17 percent, to a record level of $65.0 billion***," and "***Average noninterest-bearing deposits increased $6.4 billion, or 24 percent***."

232.   Moreover, when discussing the Commercial Bank business segment, the 2020 10-K stated, "***Average deposits increased $7.6 billion, reflecting increases in all deposit categories***" in 2020 as compared to 2019. The 2020 10-K added "Card fees increased $13 million, or 5 percent" from 2019 to 2020.

233.   Thus, the 2020 10-K was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 2020 10-K failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***2021 Proxy Statement***

234.   On March 16, 2021, the Company filed with the SEC the 2021 Proxy Statement. The 2021 Proxy Statement was solicited on behalf of Defendants Farmer,

Collins, Cregg, DiNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven. The 2021 Proxy Statement asked shareholders to vote on, *inter alia*, (1) the election of Defendant Farmer, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven to the Board; (2) ratify EY as the independent registered public accounting firm for FY 2021; (3) approval of a non-binding advisory proposal approving executive compensation; (4) approval of the Plan; and (5) approval of the 2021 Employee Stock Purchase Plan. Shareholders voted to approve all five solicitations. The misrepresentations and omissions set forth herein were material to shareholders in approving the Plan, who would not have approved the Plan had they been informed of the true financial state of the Company and the wrongdoing alleged herein.

235.   The Plan approved in the 2021 Proxy Statement made the following changes: (1) addition of 1.97 million shares permitted for issuance; (2) consolidated the current employee equity incentive plan and the current non-employee director incentive plan; and (3) certain other administrative changes.

236.   In a section titled "Role in Risk Oversight," the 2021 Proxy Statement stated:

Comerica has historically had and continues to pursue a strong risk management culture. We recognize that nearly every action taken as a financial institution requires some degree of risk. Our objective is not to eliminate risk but to give consideration to ensure we take the appropriate risks. Risk management is one of the interlinking pillars of Comerica's corporate strategy which reinforces its critical role within our organization. In choosing when and how to take risks, we evaluate our capacity for risk and seek to protect our brand and reputation, our financial flexibility, the value of our assets and the strategic potential of our Company. Each year, our Board approves a statement of our Company's risk appetite, which is used internally to help our Board and management understand our Company's tolerance for

risk in each of the major risk categories and allow for the adaption of those tolerances to align with a changing economic environment.

237.   Further, the 2021 Proxy Statement states that the following about the Audit Committee's risk oversight role: "In addition to providing oversight of our financial statements and compliance with legal and regulatory requirements, ***the Audit Committee plays a key role in risk management through the validation and oversight of our internal controls, policies and procedures to ensure their effectiveness***."

238.   Additionally, the 2021 Proxy Statement contained a letter to shareholders and signed by Defendant farmer and Defendant Smith. In their address, Defendants Farmer and Smith touted Comerica's "***record level of deposits***" in 2020. Further the 2021 Proxy Statement stated, the Company "***reached record levels of period-end assets, loans and deposits***" and there was a "***27%, or $15.6 billion, increase in total deposits to a record $72.9 billion, which included $12.0 billion growth in in noninterest-bearing deposits***."

239.   The 2021 Proxy Statement was false and misleading because it claimed the Company had adequate risk oversight and that the Audit Committee was ensuring its effectiveness, when in reality the Company had inadequate internal controls and allowed the Direct Express Misconduct to occur. Additionally, the risk controls failed to mitigate the rampant fraud that was associated with the Direct Express program.

240.   Thus, the 2021 Proxy Statement was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 2021 Proxy Statement failed to disclose that: (1) Comerica was

engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 20, 2021 Earnings Call*

241.    On April 20, 2021, the Company hosted a conference earnings call (the "1Q21 Earnings Call") to announce its first quarter 2021 results, in which Defendants Farmer and Herzog participated.

242.    In prepared remarks, Defendant Herzog stated, "***We expect non-interest income to the second quarter to benefit from higher card fees*** . . .." He furthered, "***non-interest income increased \$5 million . . . sustaining the positive trend we've seen for the past year***." Defendant Herzog further noted, "***Note card fees remained elevated. They were over 20% higher than a year ago due to government card and merchant activity spurred by . . . changes in customer behavior related to the COVID environment***." Moreover, Defendant Herzog stated, "***Average deposits increased 2% or \$1.1 billion to a new record***."

243.    Moreover, in Defendant Farmer's prepared remarks, Defendant Farmer stated, "Our progress is demonstrated in our results ***as non-interest income has increased in each of the past four quarters. Our robust card platform is a great example***. It's helped position us for the recent and likely ongoing changes in customer behavior."

*1Q21 10-Q*

244.   On April 28, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"). Attached to the 1Q21 10-Q were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

245.   The 1Q21 10-Q stated, "noninterest income increased $33 million to $270 million for the three months ended March 31, 2021, including an increase in card fees." Moreover, the 1Q21 10-Q stated the following regarding the Commercial Bank business segment, "***Noninterest income increased $32 million, primarily reflecting increases in card fees . . .***" and "***Average deposits increased $10.9 billion, reflecting increases in all deposit categories*** with the exception of time deposits." Under a heading titled "First Quarter 2021 Compared to Fourth Quarter 2020," it states, total liabilities were partially offset, in part, by an ***increase of $603 million in noninterest-bearing deposits.***"

246.   The 1Q21 10-Q incorporated by reference the disclosures published in the 2020 10-K, including those discussed in ¶¶ 225, 227, and 229. Accordingly, the 1Q 21 10-Q was materially false and/or misleading for the same reasons stated in ¶¶ 226, 228, and 230.

247.   Additionally, the 1Q21 10-Q was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 1Q21 10-Q failed to disclose that: (1) Comerica was engaged in the Direct

Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *July 21, 2021 Press Release and Earnings Call*

248. On July 21, 2021, the Company hosted an earnings conference call (the "2Q21 Earnings Call") in which Defendant Farmer and Defendant Herzog participated. In his prepared remarks, Defendant Farmer stated, "Fee generating activity was again robust. ***Non-interest income grew 5% with increases in cad, commercial lending, and fiduciary income***." Defendant Farmer furthered, "we are focused on delivering a more diversified and balanced revenue base with an emphasis on fee generation. And ***our progress is demonstrated in the consistent increase in non-interest income over the past five quarters***."

249. In Defendant Herzog's prepared remarks, he stated, "***Average deposits increased $4.1 billion, climbing to a new record***" and "***Noninterest-bearing deposits accounted for almost 75% of the growth***." He furthered, "***Card fees increased $13 million and are 23% higher than a year ago, primarily due to government card and to a lesser extent also merchant consumer and commercial card activity.***" Defendant Herzog emphasized, "we have gradually been increasing every quarter for the last five quarters."

### *2Q21 10-Q*

250.   On July 29, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q"). Attached to the 2Q21 10-Q were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

251.   The 2Q21 10-Q stated, "***Noninterest income increased $37 million to $284 million*** for the three months ended June 30, 2021, reflecting an increase in card fees . . .." Further, the 2Q21 noted "***noninterest income increased $70 million to $554 million, including increases in card fees*** . . ." and that "***[a]verage deposits increased $9.1 billion, reflecting increases in all deposit categories*** . . .."Under the heading title, "Second Quarter 2021 Compared to Fourth Quarter 2020," the 2Q21 10-Q stated, "total liabilities were offset, in part, by an ***increase of $1.1 billion in non-interest bearing deposits***."

252.   The 2Q21 10-Q incorporated by reference the disclosures published in the 2020 10-K, including those discussed in ¶¶ 225, 227, and 229. Accordingly, the 2Q21 10-Q was materially false and/or misleading for the same reasons stated in ¶¶ 226, 228, and 230.

253.   Additionally, the 2Q21 10-Q was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 2Q21 10-Q failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3)

Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### August 23, 2021 Press Release and 2020 Corporate Responsibility Report

254.   On August 23, 2021, the Company issued a press release (the "8/23/2021 Press Release"), announcing the release of its 2020 Corporate Responsibility Report noting the Company's performance across a range of categories, including technology, responsible business practices, diversity, equity & inclusion, environmental sustainability, and community support. Included in the 2020 Corporate Responsibility Report was a signed statement by Defendant Farmer, which emphasized "***Comerica's commitment to being a responsible company***."

255.   In a section titled "Financial Inclusion," the 2020 Corporate Responsibility Report emphasized the Company's selection "***by the U.S. Treasury as the Financial Agent for the Direct Express Debit MasterCard Program.***" Comerica also explained, "***not only does the innovative prepaid card program deliver benefits more cost effectively and securely***, it is an on-ramp to financial inclusion for millions of unbanked Americans – giving recipients the tools they need to participate fully in the economy."

256.   The 2020 Corporate Responsibility Report furthered, "***Direct Express® transactions are covered by regulations that protect federal benefit recipients, and funds on the cards are FDIC insured***. Cardholder satisfaction with the Direct Express® program

is high – Comerica has achieved a 92% (or better) cardholder satisfaction rating every year since the program's inception."

257. Additionally, it stated that "*the Direct Express® card protects vulnerable cardholder funds and is one of the most secure prepaid cards in the industry*," and:

> *Direct Express® has a unique partnership with Walmart that allows Direct Express® cardholders to withdraw the full balance on their card* (up to $1,000) at less than half the cost that Walmart charges other customers for the same service. Since 90 percent of our cardholders visit a Walmart at least once a year, this has proven to be a very popular service.

### October 20, 2021 Earnings Call

258. On October 20, 2021, the Company issued a press release announcing its 3Q21 financial results (the "3Q21 Press Release"). The press release stated that "*deposits increased $3.6 billion, or 5 percent, to $79.1 billion*" and that the Company experienced "*broad-based growth as . . . noninterest-bearing deposits increased . . . $1.6 billion."*

259. Also on October 20, 2021, the Company hosted an earnings conference call (the "3Q21 Earnings Call") in which Defendant Farmer and Defendant Herzog participated. Defendant Farmer in his prepared remarks stated, "Fee generating activity remained robust. *Third quarter non-interest income was up 11% on a year-over-year basis.*" Defendant Farmer furthered, "*Average deposits increased 5%, or $3.6 billion to another all-time high*."

260. Defendant Herzog in his prepared remarks stated, "*Deposits continue to grow in nearly every business line, hitting a record*" and that "*the majority of our deposits are non-interest bearing*." Regarding fourth quarter non-interest income, Defendant Herzog

stated, "*We expect continued solid performance in several customer driven fee categories such as deposit service charges, card and derivatives*." He furthered, "*We expect 2021 non-interest income will be one of the highest we've ever recorded*."

***3Q21 10-Q***

261.   On October 29, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). Attached to the 3Q21 10-Q were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

262.   The 3Q21 10-Q stated, "*Noninterest income increased $28 million to $280 million for the three months ended September 30, 2021*." Further, the report noted "*noninterest income increased $98 million to $834 million, including increases in card fees . . ..*" Regarding the Commercial Bank business segment, the 3Q21 10-Q stated, "*Noninterest income increased $89 million with increases in . . . card fees*" and "*average deposits increased $8.5 billion, reflecting increases in all deposit categories.*"

263.   The 3Q21 10-Q incorporated by reference the disclosures published in the 2020 10-K, including those discussed in ¶¶ 225, 227, and 229. Accordingly, the 3Q21 10-Q was materially false and/or misleading for the same reasons stated in ¶¶ 226, 228, and 230.

264.   Additionally, the 3Q21 10-Q was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

Specifically, the 1Q21 10-Q failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### January 19, 2022 Earnings Call and Press Release

265.   On January 19, 2022, the Company issued a press release announcing the financial results of the fourth quarter 2021 and full year 2021 (the "1/19/2022 Press Release").

266.   In a section titled "Fourth Quarter 2021 Compared to Third Quarter 2021 Overview," the press release stated, "*deposits increased $5.4 billion, or 7 percent, to $84.5 billion*" and that the Company experienced "*broad-based growth as . . . noninterest-bearing deposits increased . . . $1.4 billion.*" The press release furthered, "*Noninterest income increased $9 million to $289 million*" and there were "*Increases of $13 million in card fees.*"

267.   Under a section headed "Full-Year 2021 Compared to Full-Year 2020 Overview," the press release stated, "*Deposits increased $12.6 billion, or 19 percent, to $77.7 billion*" and that "nearly every business line experienced growth as *noninterest-bearing . . . deposits increased $8.4 billion.*"

268.   The press release also quoted Defendant Farmer, who stated, "*Average deposits grew 19 percent*" and "*While net interest income was challenged by ultra-low-rate environment, noninterest income growth was broad-based, increasing 12 percent to an all-time high*."

269.   On the same day, the Company hosted an earnings conference call (the "Full Year 2021 Earnings Call"), in which Defendants Farmer and Herzog participated. In prepared remarks, Defendant Farmer stated, "*non-interest income growth was broad-based, increasing 12% to a new record*."

270.   In Defendant Herzog's prepared remarks, Defendant Herzog stated that "*average deposits again set a record increasing $5.4 billion with nearly three quarters of the growth derived from noninterest-bearing accounts*." He furthered, "*non-interest income increased $9 million,*" and that "as far as non-interest income 2021 was the highest on record and included very strong performance in nearly every category."

### 2021 10-K

271.   On February 16, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Farmer, Herzog, Avila, Collins, Cregg, DeNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven. Attached to the 2021 10-K were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

272.   Under a heading titled "Full-Year 2021 compared to Full-Year 2020," the 2021 10-K stated, "***Average deposits increased $12.6 billion, or 19 percent, to a record $77.7 billion***" and "***Average noninterest-bearing deposits increased $8.4 billion, or 25 percent***." Regarding the Commercial Bank business segment, the 2021 10-K stated, "***Average deposits increased $9.0 billion, reflecting increases in all deposit categories***" and that "***Noninterest income increased $108 million, drive by higher . . . card fees***" between 2021 and 2020.

273.   The 2021 10-K included a disclosure discussing the Company's reliance on third party companies as vendors, which stated:

> **Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**
> Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk. In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

274.   The 2021 10-K was materially false and misleading because at the time this disclosure was filed with the SEC, the Company already knew that it was failing to comply

with the Federal Contract by using a Company vendor that operated from Lahore, Pakistan, rather than within the United States or its territories as required by the Federal Contract.

275.   The 2021 10-K also included the following disclosure regarding potential risks of fraud:

**Comerica may incur losses due to fraud.**
Fraudulent activity can take many forms and has escalated as more tools for accessing financial services emerge, such as real-time payments. Fraud schemes are broad and continuously evolving. Examples include but are not limited to: debit card/credit card fraud, check fraud, mechanical devices attached to ATM machines, social engineering and phishing attacks to obtain personal information, impersonation of our clients through the use of falsified or stolen credentials, employee fraud, information theft and other malfeasance. Increased deployment of technologies, such as chip card technology, defray and reduce aspects of fraud; however, criminals are turning to other sources to steal personally identifiable information in order to impersonate the consumer to commit fraud. Many of these data compromises have been widely reported in the media. Further, as a result of the increased sophistication of fraud activity, Comerica continues to invest in systems, resources, and controls to detect and prevent fraud. This will result in continued ongoing investments in the future.

276.   The 2021 10-K was materially false and misleading because this disclosure discussed fraud only in general terms, rather than explicitly addressing the existent issues of fraud the Company was experiencing in the Direct Express program. At the time of the 2020 10-K filing, Company executives had already raised internal concerns that the Company was in violation of Regulation E for insufficient fraud prevention and responses in connection with the Direct Express program.

277.   Additionally, the 2021 10-K included a disclosure discussing the Company's reputational risks, which stated:

**Damage to Comerica's reputation could damage its businesses.**
Reputational risk is an increasing concern for businesses as customers are interested in doing business with companies they admire and trust. Such risks include compliance issues, operational challenges, or a strategic, high profile

event. Comerica's business is based on the trust of its customers, communities, and entire value chain, which makes managing reputational risk extremely important. News or other publicity that impairs Comerica's reputation, or the reputation of the financial services industry generally, can therefore cause significant harm to Comerica's business and prospects. Further, adverse publicity or negative information posted on social media websites regarding Comerica, whether or not true, may result in harm to Comerica's prospects.

278.   The 2021 10-K was materially false and misleading because this disclosure discussed the Company's reputational risks in general terms and failed to disclose that heightened reputational risk the Company was experiencing as a result of its noncompliance with the Federal Contract by utilizing an international vendor to handle its Direct Express program accounts.

279.   Additionally, the 2021 10-K was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 2021 10-K failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***2022 Proxy Statement***

280.   On March 15, 2022, the Company filed with the SEC the 2022 Proxy Statement. The 2022 Proxy Statement was solicited on behalf of Defendants Farmer, Collins, Cregg, DiNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven.

The 2022 Proxy Statement asked shareholders to vote on, *inter alia*, (1) the election of Defendant Farmer, Avila, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven to the Board; (2) ratify EY as the independent registered public accounting firm for FY 2021; and (3) approval of a non-binding advisory proposal approving executive compensation.

281.   The 2022 Proxy Statement contained a letter to shareholders signed by Defendants Farmer and Smith, which touted "***Comerica's Average deposits grew 19 percent***" and "***noninterest income growth was broad-based, increasing 12 percent to an all-time high.***"

282.   In a section titled "2021 Peer Comparisons," the 2022 Proxy Statement stated, that the Company "***[a]chieved record levels of average assets and deposits***."

283.   In a section titled "Role in Risk Oversight," the 2022 Proxy Statement stated:

Comerica has historically had and continues to pursue a strong risk management culture. We recognize that nearly every action taken as a financial institution requires some degree of risk. Our objective is not to eliminate risk but to give consideration to ensure we take the appropriate risks. Risk management is one of the interlinking pillars of Comerica's corporate strategy which reinforces its critical role within our organization. In choosing when and how to take risks, we evaluate our capacity for risk and seek to protect our brand and reputation, our financial flexibility, the value of our assets and the strategic potential of our Company. Each year, our Board approves a statement of our Company's risk appetite, which is used internally to help our Board and management understand our Company's tolerance for risk in each of the major risk categories and allow for the adaption of those tolerances to align with a changing economic environment.

284.   Further, the 2022 Proxy Statement states that the following about the Audit Committee's risk oversight role: "In addition to providing oversight of our financial

statements and compliance with legal and regulatory requirements, ***the Audit Committee plays a key role in risk management through the validation and oversight of our internal controls, policies and procedures to ensure their effectiveness."***

285.   The 2022 Proxy Statement was false and misleading because it claimed the Company had adequate risk oversight and that the Audit Committee was ensuring its effectiveness, when in reality the Company had inadequate internal controls and allowed the Direct Express Misconduct to occur. Additionally, the risk controls failed to mitigate the rampant fraud that was associated with the Direct Express program.

286.   Additionally, the 2022 Proxy Statement was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 2022 Proxy Statement failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 20, 2022 Press Release and Earnings Call*

287.   On April 20, 2022, the Company issued a press release announcing its financial and operating results for the first quarter 2022. Under the heading titled "First Quarter 2022 Compared to First Quarter 2021 Overview," the press release stated that

"Deposits increased $7.7 billion, or 11%" and touted that "Nearly every business line experienced growth as ***noninterest-bearing . . . deposits increased $6.1 billion.***"

288.   Further, the press release quoted Defendant Farmer, who stated, "***We expect fee income to be more robust as we move through this year.***"

289.   That same day, the Company hosted an earnings conference call with investors (the "1Q22 Earnings Call") in which Defendants Farmer and Herzog participated. In prepared remarks, Defendant Herzog stated, "***we believe deposits will remain elevated***, but slowly declined (sic) as the Fed increases interest rates and significantly shrinks its balance sheet." Defendant Herzog furthered, "***For the remainder of the year, we expect significant broad-based growth in customer driven fee categories as activity picks up***. This includes card."

290.   Additionally, Defendant Farmer stated during the call, in response to an analyst's question regarding the Company's decline in deposits, "***We're always going to have a high noninterest-bearing component probably relative to our peer group*** even though we see some mix shift occurring."

***1Q22 10-Q***

291.   On April 27, 2022, the Company filed with the SEC its quarterly report for the period ended March 31, 2022 (the "1Q22 10-Q"). Attached to the 1Q22 10-Q were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

292.    Regarding the Commercial Bank business segment, the 1Q22 10-Q stated, "***Average deposits increased $4.9 billion, reflecting increases in all deposit categories*** with the exception of time deposits."

293.    The 1Q22 10-Q incorporated by reference all the disclosures from the 2021 10-K, including the materially false and misleading disclosures discussed in ¶¶ 273, 275, and 277. Accordingly, the 1Q22 10-Q was materially false and/or misleading for the same reasons stated in ¶¶ 274, 276, and 278.

294.    Additionally, the 1Q22 10-Q was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 1Q22 10-Q failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***2021 Corporate Responsibility Report***

295.    On July 6, 2022, the Company published its 2021 Corporate Responsibility Report detailing the advances the Company made on environmental, social, and governance matters. In the 2021 Corporate Responsibility Report, Defendant Farmer noted that the report reflects "***the critical importance of corporate responsibility to Comerica and our stakeholders*** and demonstrates the commitment to all of our colleagues."

296.   Regarding the Direct Express program, the 2021 Corporate Responsibility Report stated, "*Comerica Bank is the exclusive issuer of the U.S. Treasury's Direct Express® Debit MasterCard® Program to deliver government benefits electronically to 3.6 million active federal benefit recipients monthly. This prepaid card program delivers benefits cost-effectively and securely and is an on-ramp to financial inclusion for millions of unbanked Americans.*"

297.   In a section regarding Supplier Diversity, the 2021 Corporate Responsibility Report stated,

> *Our standard agreement with suppliers and contractors requires that they act in compliance with all applicable laws, including those on* equal employment opportunity, employment practices, immigration and *data protection*, and abide by Comerica's non-discrimination and diversity practices. *As Comerica primarily does business in the United States, we have no significant presence or investment in countries where lack of human rights protection is a known problem*.

298.   In a section regarding Compliance and Ethics, the Company stated:

> As one of the leading financial institutions in the U.S., we are committed to earning the trust and confidence of our customers, colleagues and stakeholders. We do this by demonstrating the highest standards of ethics and integrity in everything we do. This commitment is founded in our Core Values and embedded in our culture. *We provide our colleagues, senior leaders and Board of Directors with tools and knowledge to take ownership of this commitment and to act with integrity and in compliance with all ethical and legal responsibilities*.

> We also require that all suppliers (and/or third parties acting as agents of Comerica) conduct themselves with the same high standards of honesty, fairness and integrity. Suppliers must abide by all applicable federal, state and local laws, rules and regulations while assuring that all services are conducted with a high degree of professionalism and in accordance with the terms and conditions of the relationship.

299.    In a section titled "Code of Business Conduct and Ethics for Members of the Board of Directors," the report states:

> To assist in fostering a culture of openness and accountability, Comerica Board members are subject to our Code of Business Conduct and Ethics for Members of the Board of Directors. While Board members must also adhere to the Code of Business Conduct and Ethics for Employees and the Senior Financial Officer Code of Ethics, this Code provides the Board with guidance on recognizing and handling ethical issues, sets expectations regarding a variety of situations and provides information on how to manage unethical conduct.
>
> We are not aware of any incidents of non-compliance related to fair lending, anti-discriminatory regulations, anti-competitive behavior or anti-trust or monopoly practices occurring in 2021 that would have a material adverse effect on our operations or ability to perform the services we offer.

300.    In a section titled "Privacy and Information Security," the 2021 Corporate Responsibility Report states:

> Customer privacy and protection and cybersecurity are key topics critical to our business success. Our customers, colleagues and stakeholders trust us to safeguard their privacy, personal information and financial data, and we are committed to maintaining this trust. We continually evaluate and enhance our cybersecurity systems to meet our ethical, legal and regulatory obligations regarding cybersecurity and data privacy and improve our programs in these areas.

### *2Q22 Earnings Call and Press Release*

301.    On July 20, 2022, the Company issued a press release announcing the financial and operating results for the second quarter of 2022 (the "2Q22 Press Release"). In a section titled "Second Quarter 2022 Compared to First Quarter 2022 Overview," the press release stated, "***Noninterest income increased $24 million to $268 million***." Further,

in a section titled "Second Quarter 2022 Compared to Second Quarter 2021 Overview," the press release stated that "*Deposits increased $2.1 billion, or 3%*" and that "Most business lines experienced growth as *noninterest-bearing deposits increased $2.6 billion*."

302.   On that same day, the Company hosted an earnings conference call with investors (the "2Q22 Earnings Call"), in which Defendants Farmer and Herzog participated. In prepared remarks, Defendant Herzog stated, "on a year-over-year basis, *average deposits were up $2.1 billion*." Further, Defendant Herzog stated "*Non-interest income increased $24 million or 10%*," quarter-over-quarter.

**2Q22 10-Q**

303.   On July 28, 2022, the Company filed with the SEC its quarterly report for the period ended June 30, 2022 (the "2Q22 10-Q"). Attached to the 2Q22 10-Q were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

304.   The 2Q22 10-Q stated that "*Noninterest income increased $24 million to $268 million for the three months ended June 30, 2022*." Further, regarding the Commercial Bank business segment, the 2Q22 10-Q reported that "*Average deposits increased $2.5 billion, reflecting an increase in noninterest-bearing deposits*" for the six months ended June 30, 2022 as compared to the same period in 2021.

305.   The 2Q22 10-Q incorporated by reference all the disclosures from the 2021 10-K, including the materially false and misleading disclosures discussed in ¶¶ 273, 275,

and 277 Accordingly, the 2Q22 10-Q was materially false and/or misleading for the same reasons stated in ¶¶ 274, 276, and 278.

306.   Additionally, the 2Q21 10-Q was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 2Q21 10-Q failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *October 19, 2022 Press Release and Earnings Call*

307.   On October 19, 2022, the Company issued a press release announcing the financial and operating results for the third quarter of 2022. Under a heading titled "Third Quarter 2022 Compared to Second Quarter 2022 Overview," the press release stated that "***noninterest income increased $10 million to $278 million***."

308.   On the same day, the Company held an earnings conference call with investors (the "3Q22 Earnings Call") in which Defendants Farmer and Herzog participated. In prepared remarks, Defendant Herzog stated, "***Our mix remains favorable at 57% noninterest-bearing, reflecting the relationship and operational nature of our deposits***." Further, in response to an analyst's question about Comerica's deposit mix, Defendant

Herzog stated, "This was a little bit of a surprise to us, too, *for the mix to actually improve towards the higher noninterest-bearing*."

**3Q22 10-Q**

309.   On October 28, 2022, the Company filed with the SEC its quarterly report for the period ended September 30, 2022 (the "3Q22 10-Q"). Attached to the 3Q22 10-Q were signed certifications pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

310.   The 3Q22 10-Q stated, "*Noninterest income increased $10 million to $278 million for the three months ended September 30, 2022*." Regarding the Commercial Bank business segment, the 3Q22 10-Q stated, "Average deposits decreased $111 million," which was "partially *offset by an increase in noninterest-bearing deposits*" during the period.

311.   The 3Q22 10-Q incorporated by reference all the disclosures from the 2021 10-K, including the materially false and misleading disclosures discussed in ¶¶ 273, 275, and 277. Accordingly, the 3Q22 10-Q was materially false and/or misleading for the same reasons stated in ¶¶ 274, 276, and 278.

312.   Additionally, the 3Q22 10-Q was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 13Q22 10-Q failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating

metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### January 19, 2023 Earnings Call

313. On January 19, 2023, the Company hosted its earnings conference call regarding financial and operating results for the full year 2022 and fourth quarter 2022 (the "4Q22 Earnings Call"), in which Defendants Farmer and Herzog participated.

314. In prepared remarks, Defendant Farmer stated, "Average deposits declined $2.6 billion. ***However, balance has stabilized at quarter-end, and we began to see some positive trends***."

315. Additionally, Defendant Herzog stated in prepared remarks regarding deposits, "***Our overall mix remained favorable with 56% of average non-interest-bearing deposits***[.]" Further, Defendant Herzog stated that "***Non-interest income at Slide 11 was robust at $278 million***."

316. Regarding Comerica's deposit mix forecast for 2023, Defendant Herzog stated, "we expect to be closer to our historical 50/50 deposit mix ***still very favorable***."

### 2022 10-K

317. On February 14, 2023, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Farmer, Herzog, Avila, Collins, Cregg, Kane, Lindner, Smith,

Taubman, Turner, Vaca, and Van de Ven. Attached to the 2022 10-K were certificates pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

318. In a section titled "Full-Year 2022 compared to Full-Year 2021," the 2022 10-K stated that there was "***an increase in average noninterest bearing-deposits of $577 million, or 1 percent.***"

319. The 2022 10-K included a disclosure discussing the Company's reliance on third party companies as vendors, which stated:

> **Comerica relies on other companies to provide certain key components of its delivery systems, and certain failures could materially adversely affect operations.**
>
> Comerica faces the risk of operational disruption, failure or capacity constraints due to its dependency on third party vendors for components of its delivery systems. Third party vendors provide certain key components of Comerica's delivery systems, such as cloud-based computing, networking and storage services, cash services, payment processing services, recording and monitoring services, internet connections and network access, clearing agency services, card processing services and trust processing services. ***While Comerica conducts due diligence prior to engaging with third party vendors and performs ongoing monitoring of vendor controls, it does not control their operations. Further, while Comerica's vendor management policies and practices are designed to comply with current regulations, these policies and practices cannot eliminate this risk.*** In this context, any vendor failure to properly deliver these services could adversely affect Comerica's business operations, and result in financial loss, reputational harm, and/or regulatory action.

320. The 2022 10-K was materially false and misleading because at the time this disclosure was filed with the SEC, the Company already knew that it was failing to comply

with the Federal Contract by using a Company vendor that operated from Lahore, Pakistan, rather than within the United States or its territories as required by the Federal Contract.

321.   The 2022 10-K also included the following disclosure regarding potential risks of fraud:

> **Comerica may incur losses due to fraud.**
> Fraudulent activity can take many forms and has escalated as more tools for accessing financial services emerge, such as real-time payments. Fraud schemes are broad and continuously evolving. Examples include but are not limited to: debit card/credit card fraud, check fraud, mechanical devices attached to ATM machines, social engineering and phishing attacks to obtain personal information, impersonation of clients through the use of falsified or stolen credentials, employee fraud, information theft and other malfeasance. Increased deployment of technologies, such as chip card technology, defray and reduce aspects of fraud; however, criminals are turning to other sources to steal personally identifiable information in order to impersonate the consumer to commit fraud. Many of these data compromises have been widely reported in the media. Further, as a result of the increased sophistication of fraud activity, Comerica continues to invest in systems, resources, and controls to detect and prevent fraud. This will result in continued ongoing investments in the future.

322.   The 2022 10-K was materially false and misleading because this disclosure discussed fraud only in general terms, rather than explicitly addressing the existent issues of fraud the Company was experiencing in the Direct Express program. At the time of the 2020 10-K filing, Company executives had already raised internal concerns that the Company was in violation of Regulation E for insufficient fraud prevention and responses in connection with the Direct Express program.

323.   Additionally, the 2022 10-K included a disclosure discussing the Company's reputational risks, which stated:

> **Damage to Comerica's reputation could damage its businesses.**
> Reputational risk is an increasing concern for businesses as customers are interested in doing business with companies they admire and trust. Such risks include compliance issues, operational challenges, or a strategic, high profile

event. Comerica's business is based on the trust of its customers, communities, and entire value chain, which makes managing reputational risk extremely important. News or other publicity that impairs Comerica's reputation, or the reputation of the financial services industry generally, can therefore cause significant harm to Comerica's business and prospects. Further, adverse publicity or negative information posted on social media websites regarding Comerica, whether or not true, may result in harm to Comerica's prospects.

324.   The 2022 10-K was materially false and misleading because this disclosure discussed the Company's reputational risks in general terms and failed to disclose that heightened reputational risk the Company was experiencing as a result of its noncompliance with the Federal Contract by utilizing an international vendor to handle its Direct Express program accounts.

325.   Additionally, the 2022 10-K was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 2022 10-K failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2023 Proxy Statement*

326.   On March 13, 2023, the Company filed with the SEC its 2023 Proxy Statement. The 2023 Proxy Statement was solicited on behalf of Defendants Farmer, Avila, Collins, Cregg, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven. The 2023

Proxy Statement asked shareholders to vote on, *inter alia*, (1) the election of Defendant Farmer, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven to the Board; (2) ratify EY as the independent registered public accounting firm for FY 2021; and (3) approval of a non-binding advisory proposal approving executive compensation.

327.   In a section titled "Role in Risk Oversight," the 2023 Proxy Statement stated:

Comerica has historically had and continues to pursue a strong risk management culture. We recognize that nearly every action taken as a financial institution requires some degree of risk. Our objective is not to eliminate risk but to give consideration to ensure we take the appropriate risks. Risk management is one of the interlinking pillars of Comerica's corporate strategy which reinforces its critical role within our organization. In choosing when and how to take risks, we evaluate our capacity for risk and seek to protect our brand and reputation, our financial flexibility, the value of our assets and the strategic potential of our Company. Each year, our Board approves a statement of our Company's risk appetite, which is used internally to help our Board and management understand our Company's tolerance for risk in each of the major risk categories and allow for the adaption of those tolerances to align with a changing economic environment.

328.   Further, the 2023 Proxy Statement states the following about the Board of Director's role in risk oversight:

The Board approves a statement of our Company's risk appetite, which is used internally to help our Board and management understand our Company's tolerance for risk in each of the major risk categories and allow for the adaption of those tolerances to align with a changing economic environment.

Each of the Enterprise Risk Committee, the Audit Committee and the Governance, Compensation and Nominating Committee reports regularly to the full Board.

Michael E. Collins, the Chair of the Enterprise Risk Committee, has been designated the Board's risk expert. As a former banking and finance executive

with nearly 40 years of regulatory experience, including service with the Federal Reserve Banks of Cleveland and Philadelphia, Mr. Collins has experience identifying, assessing, and managing risk exposures of large, complex financial firms.

329. Further, the 2023 Proxy Statement states the following about Board committees' roles in risk oversight:

The Enterprise Risk Committee oversees policies, procedures and practices relating to credit risk, market risk, liquidity risk, technology risk (including cybersecurity and information security risk), operational risk, strategic risk, compliance risk (including compliance with bank regulatory obligations), and other general risks to Comerica and the actions undertaken or to be undertaken to identify, measure, monitor and control such risks. It is also responsible for environmental and social risks (*e.g.*, sustainability, climate change and corporate social responsibility).

The Audit Committee plays a key role in risk management through the validation and oversight of our internal controls, policies and procedures to ensure their effectiveness, in addition to providing oversight of our financial statements and compliance with legal and regulatory requirements.

The Governance, Compensation and Nominating Committee provides information on the risks associated with the Company's compensation programs. A more detailed discussion of the Governance, Compensation and Nominating Committee's evaluation of risk and compensation programs can be found starting on page 60.

330. The 2023 Proxy Statement was false and misleading because it claimed the Company had adequate risk oversight and that the Audit Committee was ensuring its effectiveness, when in reality the Company had inadequate internal controls and allowed the Direct Express Misconduct to occur. Additionally, the risk controls failed to mitigate the rampant fraud that was associated with the Direct Express program.

331. Additionally, the 2023 Proxy Statement was materially false and/or misleading and failed to disclose material adverse facts about the Company's business,

operations, and prospects. Specifically, the 2023 Proxy Statement failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 20, 2023 Press Release and Earnings Call*

332.   On April 20, 2023, the Company issued a press release announcing its financial results for the first quarter 2023 (the "1Q23 Press Release"). Under the heading "First Quarter 2023 Compared to Fourth Quarter 2022 Overview," the 1Q23 Press Release stated, "***Noninterest income increased $4 million to $282 million***." Furthermore, Defendant Farmer was quoted in the press release as saying, "I feel our strong deposit franchise is now more attractive as ***we retained our favorable noninterest-bearing orientation diversified across multiple businesses and geographies while improving characteristics***."

333.   That same day, the Company hosted an earnings conference call (the "1Q23 Earnings Call") in which Defendants Farmer and Herzog participated.

334.   In prepared remarks, Defendant Farmer stated, "Despite the recent industry disruption, ***we affirm the strength of our core deposit base*** by successfully retaining our relationships. ***While we saw some deposit pressure, it was predominantly localized and***

*very manageable.*" Further, Defendant Farmer stated, "We believe our strong deposit franchise is now even more attractive and stable with a lower percentage of uninsured excess deposits and less concentration with price-sensitive customers." Defendant Farmer also stated, "Broad-based loan growth and *robust noninterest income exceeded expectations,* and credit quality remained excellent[.]"

335.    During the same call, Defendant Herzog stated in his prepared remarks, "It is important to note how elevated deposit levels have been since 2020. With that context, *our current position is much stronger than prior to the pandemic as we have higher overall deposits, a better loan-to-deposit ratio, and a lower percentage of uninsured deposits.*"

336.    Defendant Herzog also emphasized, *"We feel our market and business diversification, favorable deposit mix*, commercial orientation, and connectivity into our customers' operations *combined to create greater relative stability in our deposit base.*" Defendant Herzog furthered, "Ultimately, *our deposit base has always been and continues to be a differentiating strength, and we expect even more stability with a more favorable level of uninsured and a high percentage of operating deposits.*"

337.    Defendant Herzog continued, "*We expect strong noninterest income performance to drive 6% to 7% growth over 2022. Customer-related income is projected to increase, particularly in card due to our payment strategy* and fiduciary income, which benefits from rates and investments in wealth management." Further, Defendant Herzog stated, "*With robust overall noninterest income performance in the first quarter*

*exceeding seasonally high fourth quarter results*, we feel very good about our momentum."

338.   In response to an analyst's question regarding the mix of deposits, Defendant Herzog said "*we still expect to have really one of the strongest ratios of noninterest-bearing deposits to total deposits among all our peer, if not well above our closest peers. So, we still feel really good about noninterest-bearing*."

*1Q23 10-Q*

339.   On April 28, 2023, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 10-Q"). Attached to the 1Q23 10-Q were certificates pursuant to SOX signed by Defendants Farmer and Herzog attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

340.   The 1Q23 10-Q stated, "*Noninterest income increased $4 million to $282 for the three months ended March 31, 2023*" in comparison to the three months ended December 31, 2022.

341.   The 1Q23 10-Q further stated, "*Noninterest income increased $38 million*" for the same period in 2022.

342.   Regarding the Commercial Bank business segment, the 1Q23 10-Q stated, "*Noninterest income increased $21 million*" compared to the same period in 2022.

343.   The 1Q23 10-Q incorporated by reference all the disclosures from the 2022 10-K, including the materially false and misleading disclosures discussed in ¶¶ 319, 321,

and 323. Accordingly, the 1Q23 10-Q was materially false and/or misleading for the same reasons stated in ¶¶ 320, 322, and 324.

344.   Additionally, the 1Q23 10-Q was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the 1Q23 10-Q failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

345.   On May 29, 2023, *American Banker* released an article titled "Comerica in 'Serious Violation' of Treasury's Direct Express Program."  The article revealed that Comerica was experiencing major issues with two of its vendors, i2c and Conduent Inc., whom Comerica used for the day-to-day operations of the Direct Express Program.

346.   Regarding the violation of the Federal Contract, the article stated:

Comerica Bank officials privately acknowledged significant compliance failures in their operation of a Treasury Department program that provides federal benefits on prepaid cars to millions of unbanked Americans, according to internal documents obtained by American Banker.

***A Comerica executive said the Dallas bank faced a "serious contract violation" for allowing fraud disputes and data on Direct Express cardholders to be handled out of a vendor's office in Lahore, Pakistan, the documents show***.

*Personally identifiable information on veterans, Social Security and disability recipients were routinely shared and handled by i2c Inc., a vendor based in Redwood City, Calif., with an office in Lahore, Pakistan—in violation of the government contract, the Comerica executive said. The Treasury's agreement with the bank states that all services provided "shall be performed in the United States or its territories."*

Paul Lawrence, who served as undersecretary for benefits in the Department of Veterans Affairs from 2018 to 2021, said he was in "complete shock and disgust" after being told of the information contained in the internal Comerica documents.

*"All of these government contracts basically say you have to be in the U.S. and the program has to be run by U.S. citizens," Lawrence, a longtime government consultant, said in an interview. "This has all the makings for a really, really bad situation."*

The internal documents, in addition to court documents filed in a class action last year, paint a broader picture of the $91.2 billion-asset Comerica's strategy and third-party oversight of Treasury's Direct Express program, which serves 4.5 million Americans.

Comerica has been mired in litigation and yearslong disputes over Direct Express, which it has operated under a contract with the Treasury since 2008. Direct Express deposits roughly $3 billion a month electronically on prepaid cards to millions of federal government beneficiaries who do not have a bank account. The program is part of a government effort to reduce potential fraud and costs by weaning people off paper checks.

Comerica has contracted out the day-to-day operations of Direct Express to two vendors: i2c and Conduent Inc., a publicly-traded conglomerate based in Florham Park, N.J.

*The internal documents include a 2020 email from a Comerica executive, who described sweeping violations of Regulation E, which governs how a financial institution addresses errors reported by consumers including for theft or fraud.* Nora Arpin, Comerica's then-senior vice president and director of government electronic solutions, said the bank was in breach of its Treasury contract but that it was unable to get its third-party vendor to make changes.

"***Management for Reg E dispute processing is in Lahore which means that cardholder information is being shared with/sent to Lahore, which is a serious contract violation,***" Arpin wrote.

David P. Weber, a clinical assistant professor of accounting at Salisbury University and a former supervisory counsel and enforcement chief at the Federal Deposit Insurance Corp., said the bank would need to inform its regulator about the activities of third-party service providers.

"***It was a clear violation of the contract Comerica held with the Department of the Treasury to locate the vendor in a foreign country when part of the consideration for them being awarded this federal contract was to use American employees and vendors,***" said Weber, who served as special counsel for enforcement for more than 10 years at the Office of the Comptroller of the Currency.

"***Separate and aside from contract fraud, it is inappropriate for a federally-insured depository institution to locate third-party service provider activities in a foreign nation without informing their regulator, and locating the operations in a country in which there are questions about rule of law, which would make supervisory and exam activities as well as protections of American consumers questionable.***"

The bank previously had been criticized by the Federal Reserve Bank of Dallas in a "matters requiring attention" order a year earlier, which described "weaknesses" in Comerica's risk monitoring of Direct Express, according to court documents. Examiners said Conduent, the bank's primary vendor, did not provide cardholders reporting fraud on their cards with information on how to receive a provisional credit, documents show.

Comerica was paid $151 million in 2020 to operate Direct Express, and received roughly $770 million in total gross revenue over a six year period, from 2015 to 2020, to run the program, Albert Taylor, a Comerica senior vice president and director of National Bankcard Services, said in court documents.

* * *

**Inadequate fraud reporting**
***In a key internal 2020 email, Arpin, the former Comerica executive, listed 13 bullet points describing the practices of i2c.*** Among the bank's "serious concerns," she wrote:

- "We are having significant difficulty getting adequate fraud reporting."
- "We can't get the Call Center statistics we need."
- "Reg E adjudication is an issue"
- "Fraud prevention is a serious issue"
- "Reporting in general is an issue – we aren't getting the reporting that the [Treasury's Bureau of] Fiscal Services requires."

Cardholders have complained for years about fraud, poor customer service and high fees in the Direct Express program. Last year, a federal judge certified a class action against Comerica and Conduent brought by Direct Express cardholders who claimed their accounts were drained of thousands of dollars from 2015 to 2022 due to fraud.

The class action, filed in the U.S. District Court for the Western District of Texas, alleges that Comerica and Conduent denied refunds to cardholders who alleged fraud on their accounts. The court documents, combined with internal documents that American Banker received anonymously in the mail, provide a better understanding of Comerica's private and public responses to various inquiries.

***Comerica executives were repeatedly warned about vendor oversight, potential breaches of the Treasury contract and deficiencies in the bank's compliance management system, said sources familiar with the matter who asked that they remain anonymous out of fear of retaliation. In-house lawyers escalated their concerns to the bank's senior leadership, including Susan Joseph, Comerica's head of compliance; Jay Oberg, senior executive vice president and chief risk officer; and Peter L. Sefzik, senior executive vice president and chief banking officer.***

\* \* \*

In August 2018, Sen. Elizabeth Warren, D-Mass., launched an investigation into Direct Express after cardholders complained about not being reimbursed for fraud. In a letter to the Veterans Administration, Warren said fraudsters had used "stolen data to impersonate benefit recipients, made fraudulent purchases, and drained the prepaid cards of the federal benefits."

Comerica's Executive Chairman Ralph W. Babb responded to Warren by stating that Comerica has taken appropriate steps to root out fraud.

Comerica "follows all laws and regulations including the [Federal Financial Institutions Examination Council] guidelines for supplier oversight," Babb said in a 21-page response in October 2018.

**'Reg E Lite'**

Yet, within a month of Sen. Warren's inquiry, a Comerica lawyer tried to convince a Texas bank examiner that Regulation E does not apply to the bank or to federal government beneficiaries, the internal documents show.

The Comerica lawyer was responding to a query from the Texas Department of Banking by claiming that the bank was not fully required to abide by the Electronic Fund Transfer Act, which is implemented by Regulation E. The regulation sets strict timelines for banks to resolve errors including investigating fraud and reimbursing harmed consumers with provisional credit when money is stolen.

*"Program customers only get 'Regulation E Lite,' benefits,"* a Comerica executive in the bank's legal department wrote in 2018. That lawyer described "why [the] program's customers are not entitled to all of the provisions and benefits of Regulation E."

In the email, the Comerica lawyer wrote that "...neither the Federal Electronic Funds Transfer nor its Regulation E applies to the Comerica Bank under the Program as a 'financial institution."

Comerica argued that the Treasury, not the bank, was considered to be the financial institution for Direct Express, "which is why we generally state that Program customers are only entitled to 'Regulation E lite' benefits."

By August 2019, Joseph, the head of compliance, had forwarded the email about 'Reg E Lite," to another Comerica lawyer.

Comerica submitted a glossy, 67-page application to the Treasury in early 2019 in which *it described the vendor, i2c, "as a leader in transaction processing, security, fraud prevention and innovation."*

In 2020, Treasury renewed Comerica's contract after i2c was hired to handle new cardholders. The agreement with the Treasury was signed by Babb, who retired in 2019. Babb was succeeded by Curt C. Farmer, Comerica's chairman and CEO.

Experts say banks have a general obligation to act in good faith when dealing with customers.

*Weber, the accounting professor and former regulator, said the bank's legal and compliance obligations far exceed Regulation E. He also called into question Comerica's third-party risk management and operational risk standards.*

*"The unbanked people already are more vulnerable than ordinary bank customers because they don't have the skill set or financial acumen to know what their rights are, and it's compounded when they are victims of fraud,"* Weber said. *"At the end of the day, federally insured depository institutions are required to have appropriate third-party risk management processes in place, and it isn't new to prepaid cards or benefits."*

Weber noted that Bank of America was hit with a $225 million consent order last year for failing to investigate fraud claims in unemployment benefits.

*"The idea in a perfect world is that somehow the third-party vendor can do it faster and cheaper than the bank because they think they're not obligated to follow the same rules," said Weber, who analyzes counterproductive work behavior. "It's an operational risk issue if the third-party doesn't have the policies, procedures and controls to identify systemic issues."*

**VA finds a way out**

*The myriad problems in the Direct Express program, which Comerica manages, forced the Veterans Administration to devote resources to helping veterans find an alternative.* By 2019, the VA helped create the Veterans Benefit Banking Program, a consortium of banks and credit unions that offer free checking accounts so veterans can receive their monthly payments via direct deposit.

*"We made a super-conscientious effort to get veterans off Direct Express because the bad experiences were just gut-wrenching,"* said Lawrence, the VA's undersecretary for benefits.

Steve Lepper, a retired U.S. Air Force Major General who is president and CEO of the Association of Military Banks of America, a trade group, worked with the VA to create the program.

Verified Shareholder Derivative Complaint

*"The complaints the VA was getting finally pushed them to the point where we needed to create an alternative to the Direct Express program,"* Lepper said. *"Veterans were apoplectic about all of the problems that they were experiencing with the Direct Express program and, of course, Comerica was responsible for all of the management of the program — including the fraud investigation and resolution processes."*

Roughly 240,000 veterans have migrated away from Direct Express and now have bank accounts with direct deposit, Lepper said. About 80,000 unbanked or underbanked veterans still receive their benefits on Direct Express prepaid cards or paper checks.

Lepper credited J.B. Simms, an author and private investigator in Brighton, Tenn., who recently published a book titled, "Comerica, Conduent and the U.S. Treasury Betrayed Veterans and Other Victims." Simms says he first discovered fraudulent charges on his Direct Express account in January 2017 and a second time later that year. He then sought to help other veterans recover money that was stolen due to fraud, including those in which veterans' claims were denied.

**Alleged violations**

Simms and others say Comerica's failure to address problems with Direct Express should get a public airing.

*"The Direct Express cardholders are the most vulnerable population of all Social Security recipients, and most do not have bank accounts and lack the sophistication to challenge any authority,"* said Simms. He is one of just eight named plaintiffs in the case.

Another plaintiff, Harold McPhail, a Vietnam veteran, reported that $30,000 was stolen from his Direct Express account in 2018. But he died before getting a resolution, said his daughter Martisha McPhail, who said Conduent initially denied her father's fraud claim.

Some Social Security recipients who reported fraud have lost hope that they will ever be reimbursed for thousands of dollars they say was stolen off their prepaid cards. Some said they have not been notified of the class action or any efforts by the bank to reimburse them.

Mike Colburn, a retired Las Vegas businessman, alleged that $5,500 was stolen from his Direct Express account in 2018. Colburn said he was unable to make his mortgage payment and had to borrow money from relatives to avoid defaulting. He ultimately was reimbursed $500 by Conduent but was never able to get all of his money back.

"I gave up on talking to that bank," Coburn said. ***They don't return phone calls, they don't return emails and Conduent accused me of stealing the money from myself.***"

After money was allegedly stolen from his Direct Express account, Colburn called the Social Security Administration to sign up for paper checks. Now his monthly Social Security check comes with an insert stating that he is breaking the law for not using Direct Express, he said.

Cardholders allege in the class action that they were not given provisional credit when errors were reported and were not sent the results of investigations in a timely manner. Regulation E requires that a financial institution investigate fraud within 10 days of being notified by a cardholder, but the bank can take up to 45 days to investigate if they provide provisional credit in the amount of the alleged error.

"Nobody could get through to the call center and most of the time people never filed a claim because they got locked out of their accounts," said Jackie Densmore, a plaintiff in the class action, who is a caregiver for her brother-in-law, Derek Densmore, a disabled Marine. She alleged $800 was stolen from his Direct Express card in 2018 and described hours spent trying to get through to Conduent on the phone and being told to submit a claim in writing.

"There are all these people out there who were never able to complete a fraud packet and actually file a claim," Densmore said.

The vendor had run into problems before with government oversight. Conduent was fined by the Consumer Financial Protection Bureau in 2019 for unfair student loan practices, and in 2017 for sending incorrect information to credit reporting agencies. In 2019, Conduent, which at the time was owned by Xerox Corp., agreed to a $235 million settlement with the Texas attorney general for Medicaid-related claims.

Densmore also switched to paper checks for her brother-in-law, who has post-traumatic stress disorder. Symptoms resurface every month, she said, when

he sees the insert from Social Security that states: "Notice of noncompliance. You are required by law to convert your paper check to direct deposit or the Direct Express card."

"Every month we relive the nightmare from five years ago," she said. "Since Derek has a medical condition, I have to explain to him every month about the situation that we have gone through with Direct Express and that he is allowed to get a paper check."

**What's next for Comerica customers?**

***Court documents show that in May 2019 alone, Comerica received 15,712 fraud disputes, according to Taylor, Comerica's director of National Bankcard Services.*** Taylor said in court documents that Comerica did not have any data to identify cardholders that reported fraud, and the bank didn't keep track of money refunded or denied for fraud.

The supervisory letter from the Federal Reserve Bank of Dallas in early 2019 identified potential consumer harm, program deficiencies and customer service issues in Comerica's handling of Direct Express. Specifically, examiners at the Dallas Fed said that Conduent's call centers were not trained in Regulation E and did not tell cardholders who reported fraud that they could receive provisional credit as part of the process of filing a dispute.

"Only those callers who specifically asked for instructions or inquired about the provisional credit process received any guidance," the Dallas Fed stated in the supervisory letter sent to Joseph, Comerica's head of compliance.

In addition, Conduent required that cardholders provide documents and a written statement but did not state that cardholders had 10 days to do so or they may not receive provisional credit.

"While [an] explanation of provisional credit is not a regulatory requirement, the recurring consumer complaints regarding provisional credit indicate consumers are adversely affected," the Dallas Fed stated.

It also noted more systemic problems in the collection of data.

"There is no root cause analysis of complaints to identify systemic issues and trends that warrant immediate correction," according to the supervisory letter. "Comerica must establish a method of identifying root causes of complaints

originating at Conduent and track complaints with serious allegations or high compliance risk, such as [unfair, deceptive acts and practices.]"

**A problem of incentives**

In its bid for the Treasury contract, Comerica said it is "committed to delivering a low-cost solution, while providing ready access to funds and protecting both the Direct Express cardholder and the overall program."

Comerica receives fees, interchange revenue and annual payments from the Treasury that rose to $151 million in 2020, the most recent data available, according to court documents. Of that total, Conduent received $105 million in 2020 from Comerica, Mitch Raymond, a senior director in account management at Conduent, said in court documents.

Comerica also benefits from an estimated $3 billion a month in low-cost, non-interest-bearing deposits from the Direct Express program, sources familiar with the program said. The deposits boost the bank's liquidity at little cost and can be leveraged, allowing the bank to lend to more customers, sources said.

Last year, Comerica disclosed that the Consumer Financial Protection Bureau is investigating some of its business practices. The Texas bank stated in a regulatory filing in February 2022: "Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the corporation's business practices and may result in increased operating expenses or decreased revenues."

Weber, the former FDIC enforcement chief, said that regulators typically take into account whether information exists to indicate that a bank "is willfully in noncompliance with the law." To deter misconduct, regulators may factor into a civil money penalty whether a bank's executives and board directors believed a potential fine would be lower than the cost of compliance.

"It's a mixture of misplaced financial incentives combined with failing to have appropriate board and management oversight over different operational areas of the bank," said Weber, who also served as a former assistant inspector general for investigations at the Securities and Exchange Commission. "When evidence indicates that individual officers or directors have made decisions to allow misconduct and violations of the law to occur, it is well past time to not only hold the bank accountable but to hold the individual officers and directors and the entire board personally accountable."

Simms, one of the plaintiffs in the class action, lays the blame for the problems on shoddy third-party oversight by the Treasury.

***"The Bureau of Fiscal Service, as a part of the U.S. Treasury, allowed Comerica Bank to continue violating federal banking laws and endorsed the contract with Comerica knowing inaccurate information was submitted by Comerica to obtain the contract,"*** Simms said, citing the OIG reports.

Lepper, who helped create the alternative option for veterans, said he didn't understand why the most vulnerable citizens were not getting the attention of Comerica top executives.

"Why didn't they make the obvious improvements to their program to avoid all of this?" Lepper said.

347.   On this news, the price of Comerica's stock declined by $1.40 per share, or 3.59%, dropping from $38.99 at the closing of trade on May 29, 2023 to close at $37.59 per share on May 30, 2023.

348.   On May 31, 2023, the Company's stock price continued to drop falling an additional $1.49, or 3.96%, to close at $36.10.

349.   Thus, throughout the Relevant Period the Individual Defendants' statements were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Defendants made false and/or misleading statements and/or failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain

adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

350.    Additionally, the foregoing statements made above that reported financial and operating metrics and results, revenues, earnings, card fees, and deposits were materially false and misleading because they made these disclosures and statements without revealing to investors and the public that these results were generated through improper practices, unreported operational setbacks, and undisclosed negative trends.

## **Repurchases During the Relevant Period**

351.    During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company, which overpaid an aggregate amount of over $445 million for repurchases of its own stock during the Relevant Period.

352.    According to the 2Q21 10-Q, within the Relevant Period, the Individual Defendants caused the Company to, in April 2021, repurchase 4.461 million shares of its own common stock at an average price per share of approximately $77.10, for a total cost to the Company of approximately $343.9 million.

353.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $41 more than the actual worth of each share within the Relevant

Verified Shareholder Derivative Complaint

Period during April 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during April 2021 was approximately $182.9 million.

354. According to the 2Q21 10-Q, within the Relevant Period, the Individual Defendants caused the Company to, in June 2021, repurchase 1.421 million shares of its own common stock at an average price per share of approximately $74.65, for a total cost to the Company of approximately $106,077,650.

355. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $38.55 more than the actual worth of each share within the Relevant Period during June 2021. This, the total over payment by the Company for repurchases of its own stock within the Relevant Period during June 2021 was approximately $54.77 million.

356. According to the 3Q21 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in July 2021, repurchase 477,000 shares of its own common stock at an average price per share of approximately $68.22, for a total cost to the Company of approximately $32,540,940.

357. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $32.21 more than the actual worth of each share purchased within the Relevant Period during July 2021. Thus, the total overpayment by the Company

for repurchases of its own stock within the Relevant Period during July 2021 was approximately $15,321,240.

358.  According to the 3Q21 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in August 2021, repurchase 1.737 million shares of its own common stock at an average price per share of approximately $72.85, for a total cost to the Company of approximately $126,540,450.

359.  Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $36.75 more than the actual worth of each share purchased within the Relevant Period during August 2021. Thus, the total overpayment by the Company for repurchases of its own stock within the Relevant Period during August 2021 was approximately $109,320,750.00.

360.  According to the 3Q21 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in September 2021, repurchase 838,000 shares of its own common stock at an average price per share of approximately $71.81, for a total cost to the Company of approximately $60,176,780.

361.  Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $35.71 more than the actual worth of each share purchased within the Relevant Period during September 2021. Thus, the total overpayment by the

Company for repurchases of its own stock within the Relevant Period during September 2021 was approximately $29,924,980.00.

362. According to the 2021 10-K, within the Relevant Period, the Individual Defendant caused the Company to, in October 2021, repurchase 1,000 shares of its own common stock at an average price per share of approximately $80.79, for a total cost to the Company of approximately $80,790.

363. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $44.69 more than the actual worth of each share purchased within the Relevant Period during October 2021. Thus, the total overpayment by the Company for repurchases of its own stock within the Relevant Period during October 2021 was approximately $44,690.00.

364. According to the 1Q22 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in January 2022, repurchase 15,000 shares of its own common stock at an average price per share of approximately $90.37, for a total cost to the Company of approximately $1,355,550.

365. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $54.27 more than the actual worth of each share purchased within the Relevant Period during January 2022. Thus, the total overpayment by the

Company for repurchases of its own stock within the Relevant Period during January 2022 was approximately $814,050.00.

366. According to the 1Q22 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in February 2022, repurchase 112,000 shares of its own common stock at an average price per share of approximately $94.81, for a total cost to the Company of approximately $10,618,720.

367. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $58.71 more than the actual worth of each share purchased within the Relevant Period during February 2022. Thus, the total overpayment by the Company for repurchases of its own stock within the Relevant Period during February 2022 was approximately $6,575,520.00.

368. According to the 1Q22 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in March 2022, repurchase 272,000 shares of its own common stock at an average price per share of approximately $91.79, for a total cost to the Company of approximately $ 24,966,880.

369. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $58.71 more than the actual worth of each share purchased within the Relevant Period during March 2022. Thus, the total overpayment by the

Verified Shareholder Derivative Complaint

Company for repurchases of its own stock within the Relevant Period during March 2022 was approximately $15,147,680.00.

370.   According to the 2Q22 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in April 2022, repurchase 2,000 shares of its own common stock at an average price per share of approximately $90.85, for a total cost to the Company of approximately $181,700.

371.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $54.75 more than the actual worth of each share purchased within the Relevant Period during April 2022. Thus, the total overpayment by the Company for repurchases of its own stock within the Relevant Period during April 2022 was approximately $109,500.

372.   According to the 2Q22 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in June 2022, repurchase 2,000 shares of its own common stock at an average price per share of approximately $73.86, for a total cost to the Company of approximately $147,720.

373.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $37.58 more than the actual worth of each share purchased within the Relevant Period during June 2022. Thus, the total overpayment by the Company

for repurchases of its own stock within the Relevant Period during June 2022 was approximately $75,520.

374. According to the 3Q22 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in July 2022, repurchase 2,000 shares of its own common stock at an average price per share of approximately $74.64, for a total cost to the Company of approximately $149,280.

375. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $38.54 more than the actual worth of each share purchased within the Relevant Period during July 2022. Thus, the total overpayment by the Company for repurchases of its own stock within the Relevant Period during July 2022 was approximately $77,080.

376. According to the 2022 10-K, within the Relevant Period, the Individual Defendant caused the Company to, in October 2022, repurchase 2,000 shares of its own common stock at an average price per share of approximately $72.44, for a total cost to the Company of approximately $144,880.

377. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $36.34 more than the actual worth of each share purchased within the Relevant Period during October 2022. Thus, the total overpayment by the

Verified Shareholder Derivative Complaint

Company for repurchases of its own stock within the Relevant Period during October 2022 was approximately $72,680.

378.   According to the 1Q23 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in January 2023, repurchase 2,000 shares of its own common stock at an average price per share of approximately $66.47, for a total cost to the Company of approximately $132,940.

379.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $30.37 more than the actual worth of each share purchased within the Relevant Period during January 2023. Thus, the total overpayment by the Company for repurchases of its own stock within the Relevant Period during January 2023 was approximately $60,740.

380.   According to the 1Q23 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in February 2023, repurchase 29,000 shares of its own common stock at an average price per share of approximately $73.16, for a total cost to the Company of approximately $2,121,640.

381.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $37.06 more than the actual worth of each share purchased within the Relevant Period during February 2023. Thus, the total overpayment by the

Company for repurchases of its own stock within the Relevant Period during February 2023 was approximately $1,074,740.

382.  According to the 2Q23 10-Q, within the Relevant Period, the Individual Defendant caused the Company to, in April 2023, repurchase 3,000 shares of its own common stock at an average price per share of approximately $42.36, for a total cost to the Company of approximately $127,080.

383.  Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $6.26 more than the actual worth of each share purchased within the Relevant Period during April 2023. Thus, the total overpayment by the Company for repurchases of its own stock within the Relevant Period during April 2023 was approximately $18,780.

384.  Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $445 million.

## DAMAGES TO COMERICA

385.  As a direct and proximate result of the Individual Defendants' misconduct, Comerica has lost and expended, and will lose and expend, many millions of dollars.

386.  Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and two of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

387.   Such losses include the Company's overpayment by nearly $445.9 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

388.   Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Direct Express Misconduct.

389.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

390.   As a direct and proximate result of the Individual Defendants' conduct, Comerica has also suffered and will continue to suffer a loss of reputation and goodwill that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

391.   Plaintiff brings this action derivatively and for the benefit of Comerica to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Comerica, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as the aiding and abetting thereof.

392.   Comerica is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

393.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Comerica. Plaintiff will adequately and fairly represent the interests of Comerica in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

394.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

395.   A pre-suit demand on the Board of Comerica is futile and, therefore, excused. At the time of filing of this action, the Board consists of the Director-Defendants, and non-parties Arthur G. Angulo, M. Alan Gardner, Derek J. Kerr, and Jennifer H. Sampson (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to eight of fifteen Directors that were on the Board at the time this action was commenced.

396.   Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause or permit the Company to engage in the Direct Express Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts.

397.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

398.   Each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $445 million for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

399.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing or permitting the Company to engage in the Direct Express Misconduct and making and/or causing the Company to make the materially false and misleading statements alleged herein. As a result of the foregoing, the

Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

400. Additional reasons that demand on Defendant Farmer is futile follow. Defendant Farmer has served as the Company's CEO since April 2019 and as Chairman of the Board since January 2020. As such, the Company provides Defendant Farmer with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO and Chairman throughout the Relevant Period, Defendant Farmer was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those he made in the earnings conference calls and those contained in the 2020 10-K, 2021 10-K, 2022 10-K (the "10-Ks") and the 1Q20 10-Q, 2Q20 10-Q, 3Q20 10-Q, 1Q21 10-Q, 2Q21 10-Q, 3Q21 10-Q, 1Q22 10-Q, 2Q22 10-Q, 3Q22 10-Q, and 1Q23 10-Q (the "10-Qs"), cited above. In addition, he solicited the 2021, 2022, and 2023 Proxy Statements which contained false and misleading elements that contributed*, inter alia*, to shareholders approving, on an advisory basis, his unjust compensation, approving the Plan, and reelecting him to the Board. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Direct Express Misconduct and to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties. Furthermore, Defendant Farmer is a defendant in the Securities Class Action. Defendant Farmer further breached his fiduciary duties by trading

39,066 shares of Company common stock on insider information while the price was artificially inflated and before the truth had revealed, and thereby net approximately $2.635 million in proceeds. For these reasons, too, Defendant Farmer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

401. Additional reasons that demand on Defendant Avila is futile follow. Defendant Avila has served as a Company director since 2022. As a member of the Board, she serves on the Enterprise Risk Committee. For her service on the Board, Defendant Avila has received and will continue to receive substantial compensation. As a trusted Company director, she conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Avila signed the 2021 and 2022 10-K, and thus personally made the false and misleading statements contained therein.  Moreover, Defendant Avila solicited the 2023 Proxy Statement, which contained false and misleading elements that contributed to her reelection to the Board. For these reasons, Defendant Avila breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

402. Additional reasons that demand on Defendant Collins is futile follow. Defendant Collins has served as a Company director since 2016. As a member of the Board,

he serves as the Chair of the Enterprise Risk Committee, as a member of the Qualified Legal Compliance Committee, and as a member of the Audit Committee. For his service on the Board, Defendant Collins has received and will continue to receive substantial compensation. As a trusted Company director, he conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Collins signed the 10-Ks, and thus personally made the false and misleading statements contained therein.  Moreover, Defendant Collins solicited the 2021, 2022, and 2023 Proxy Statement, which contained false and misleading elements that contributed to, *inter alia*, his reelection to the Board and the approval of the Plan. For these reasons, Defendant Collins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

403. Additional reasons that demand on Defendant Cregg is futile follow. Defendant Cregg has served as a Company director since 2006. As a member of the Board, he serves as Chair of the Audit Committee, Chair of the Qualified Legal Compliance Committee, and as a member of the Enterprise Risk Committee. For his service on the Board, Defendant Cregg has received and will continue to receive substantial compensation. As a trusted Company director, he conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make

false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Cregg signed the 10-Ks, and thus personally made the false and misleading statements contained therein. Moreover, Defendant Cregg solicited the 2021, 2022, and 2023 Proxy Statement, which contained false and misleading elements that contributed to, *inter alia*, his reelection to the Board and the approval of the Plan. For these reasons, Defendant Cregg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

404. Additional reasons that demand on Defendant Kane is futile follow. Defendant Kane has served as a Company director since 2008. As a member of the Board, she serves as the Chair of the Governance, Compensation & Nominating Committee. For her service on the Board, Defendant Kane has received and will continue to receive substantial compensation. As a trusted Company director, she conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Kane signed the 10-Ks, and thus personally made the false and misleading statements contained therein. Moreover, Defendant Kane solicited the 2021, 2022, and 2023 Proxy Statements, which contained false and misleading elements that contributed to, *inter alia*, her reelection to the Board

141

Verified Shareholder Derivative Complaint

and shareholder approval of the Plan. For these reasons, Defendant Kane breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

405.   Additional reasons that demand on Defendant Lindner is futile follow. Defendant Lindner has served as a Company director since 2008. As a member of the Board, he serves on the Audit Committee, the Governance, Compensation, & Nominating Committee, and the Qualified Legal Compliance Committee. For his service on the Board, Defendant Lindner has received and will continue to receive substantial compensation. As a trusted Company director, he conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Lindner signed the 10-Ks, and thus personally made the false and misleading statements contained therein. Moreover, Defendant Lindner solicited the 2021, 2022, and 2023 Proxy Statement, which contained false and misleading elements that contributed to, *inter alia*, his reelection to the Board and the approval of the Plan. For these reasons, Defendant Lindner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

406.   Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since 2017. As a member of the Board,

she serves on the Governance, Compensation & Nominating Committee. For her service on the Board, Defendant Smith has received and will continue to receive substantial compensation. As a trusted Company director, she conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Smith signed the 10-Ks, and thus personally made the false and misleading statements contained therein. Moreover, Defendant Smith solicited the 2021, 2022, and 2023 Proxy Statements, which contained her signed false and misleading letter to shareholders and the false and misleading elements that contributed to, *inter alia*, her reelection to the Board and shareholder approval of the Plan. For these reasons, Defendant Smith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

407.   Additional reasons that demand on Defendant Taubman is futile follow. Defendant Taubman has served as a Company director since 2000. As a member of the Board, he serves on the Enterprise Risk Committee. For his service on the Board, Defendant Taubman has received and will continue to receive substantial compensation. As a trusted Company director, he conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and

engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Taubman signed the 10-Ks, and thus personally made the false and misleading statements contained therein. Moreover, Defendant Taubman solicited the 2021, 2022, and 2023 Proxy Statement, which contained false and misleading elements that contributed to, *inter alia*, his reelection to the Board and the approval of the Plan. For these reasons, Defendant Taubman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

408. Additional reasons that demand on Defendant Turner is futile follow. Defendant Turner has served as a Company director since 2005. As a member of the Board, he serves on the Audit Committee and the Qualified Legal Compliance Committee. For his service on the Board, Defendant Turner has received and will continue to receive substantial compensation. As a trusted Company director, he conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Turner signed the 10-Ks, and thus personally made the false and misleading statements contained therein. Moreover, Defendant Turner solicited the 2021, 2022, and 2023 Proxy Statement, which contained false and misleading elements that contributed to, *inter alia*, his reelection to the Board and the approval of the Plan. For these reasons, Defendant Turner breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

409.    Additional reasons that demand on Defendant Vaca is futile follow. Defendant Vaca has served as a Company director since 2017. As a member of the Board, she serves on the Governance, Compensation & Nominating Committee. For her service on the Board, Defendant Vaca has received and will continue to receive substantial compensation. As a trusted Company director, she conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Vaca signed the 10-Ks, and thus personally made the false and misleading statements contained therein. Moreover, Defendant Vaca solicited the 2021, 2022, and 2023 Proxy Statements, which contained false and misleading elements that contributed to, *inter alia*, her reelection to the Board and shareholder approval of the Plan. For these reasons, Defendant Vaca breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

410.    Additional reasons that demand on Defendant Van de Ven is futile follow. Defendant Van de Ven has served as a Company director since 2016. As a member of the Board, he serves on the Governance, Compensation, and Nominating Committee. For his service on the Board, Defendant Van de Ven has received and will continue to receive

substantial compensation. As a trusted Company director, he conducted little, if any oversight of the schemes to cause the Company to engage in the Direct Express Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Van de Ven signed the 10-Ks, and thus personally made the false and misleading statements contained therein. Moreover, Defendant Van de Ven solicited the 2021, 2022, and 2023 Proxy Statement, which contained false and misleading elements that contributed to, *inter alia*, his reelection to the Board and the approval of the Plan. For these reasons, Defendant Van de Ven breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

411.   Demand on the Director-Defendants is also futile because they will benefit in the future from the Individual Defendants' solicitation of the 2021 Proxy Statement which called for shareholder approval of the amended Plan. The amended Plan called for an increase in the number of shares authorized to be issued under the existing plan by 1.97 million, almost doubling the approximately 2.9 million shares left eligible for issuance under the Plan; the Director-Defendants will continue to receive compensation pursuant to the amended Plan while they remain as directors. Shareholders would not have approved the amended Plan had they known the true state of affairs at the Company. As a result, the Director-Defendants cannot be presumed to be disinterested in taking action against those who solicited the materially false and misleading 2021 Proxy Statement, including

Defendants Farmer, Collins, Cregg, DiNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven. As such, demand upon the Directors is futile and, therefore, excused.

412. Additionally, the Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. They have worked together for years. For example, Defendant Taubman has served on the Board since 2000. During his 24-year tenure, he has served with Defendant Cregg since 2006, Defendants Kane, Lindner, and Vaca since 2008, and with Defendant Turner since 2004. These decades-long relationships have rendered the Defendants unable to effectively monitor each other and unwilling to effectuate actions against another Board member for violations of their fiduciary duties. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question each other's and the remaining Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

413. Defendants Cregg, Kerr, Lindner, and Turner (collectively, the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting Direct Express Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment,

147

abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's Audit Committee, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company' disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

414.   Defendants Avila, Collins, Cregg, and Taubman (collectively, the "Enterprise Risk Committee Defendants"), served on the Enterprise Risk Committee during the Relevant Period. The Enterprise Risk Committee Defendants violated the Enterprise Risk Committee Charter by engaging in or permitting the Direct Express Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Enterprise Risk Committee Defendants violated the Enterprise Risk Committee Charter by failing to adequately review the Company's risk-management procedures, including reviewing management's risk management structure as it related to the Direct Express program. As revealed through the confidential witnesses' statements, executives at the Company were well aware that the

vendors' conduct was beyond the acceptable risk standards. Yet, the Enterprise Risk Committee failed to ameliorate this material risk. By failing to adhere to the charter, the Enterprise Risk Committee enabled and/or actively engaged in the Direct Express Misconduct and therefore breached their fiduciary duties, are not disinterested, and demand is excused as to them.

415.   In violation of the Director's Code of Conduct and the spirit of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to engage in the Direct Express Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of the Exchange Act. In addition, the Individual Defendants violated the Director's Code of Conduct by failing to act with integrity, supporting and profiting from unethical academic behavior, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Director's Code of Conduct and the law. Thus, the Director-Defendants breached the Company's Director's Code of Conduct and the spirit of the Code of Conduct, are not disinterested, and demand is excused as to them.

416.   Comerica has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits

against the Director-Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Comerica any part of the damages Comerica suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

417.   The acts complained of herein constitute violations of fiduciary duties owed by Comerica's officers and directors, and these acts are incapable of ratification.

418.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Comerica. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Comerica, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

419.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad

faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

420.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Comerica to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

421.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants Farmer, Avila, Collins, Cregg, DeNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven for Violations of Section 14(a) of the Exchange Act**

422.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

Verified Shareholder Derivative Complaint

423.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

424.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

425.   Under the direction and watch of the Defendants Farmer, Avila, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven, the 2021, 2022, and 2023 Proxy Statements failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

426.   Moreover, the 2021, 2022, and 2023 Proxy Statements failed to disclose that the Board's oversight and risk mechanisms were not adequate given the aforementioned misconduct and that the Code of Conduct and Director's Code of Conduct was not complied with.

427.   Defendants Farmer, Collins, Cregg, DiNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of directors.

428.   Defendants Farmer, Collins, Cregg, DiNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors.

429.   Defendants Farmer, Avila, Collins, Cregg, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy

Verified Shareholder Derivative Complaint

Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the election of directors.

430.   The false and misleading elements of the 2021 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Farmer, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven to the Board, allowing them to continue or begin breaching their fiduciary duties to the Company and (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Farmer, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven, who were breaching their fiduciary duties to the Company; and (3) amend the Plan to increase the number of shares available for issuance under non-employee director compensations, thereby rewarding Defendants Farmer, Collins, Cregg, DeNicola, Kane, Lindner, Smith Taubman, Turner, Vaca, and Van de Ven who were breaching their fiduciary duties.

431.   The false and misleading elements of the 2022 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Farmer, Collins, Cregg, DiNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven, and to the Board, allowing them to continue or begin breaching their fiduciary duties to the Company and (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Farmer, Collins, Cregg, DiNicola, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven, who were breaching their fiduciary duties to the Company.

432.   The false and misleading elements of the 2023 Proxy Statement led Company shareholders to, *inter alia*: (1) elect Farmer, Avila, Collins, Cregg, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven to the Board, allowing them to continue or begin breaching their fiduciary duties to the Company and (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Farmer, Avila, Collins, Cregg, Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven, who were breaching their fiduciary duties to the Company

433.   The Company was damaged as a result of Defendants Farmer, Avila, Collins, Cregg, DeNicola Kane, Lindner, Smith, Taubman, Turner, Vaca, and Van de Ven's material misrepresentations and omissions in the 2021, 2022, and 2023 Proxy Statements.

434.   Plaintiff on behalf of Comerica has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

435.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

436.   The Individual Defendants, by virtue of their positions with Comerica and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Comerica and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause

Comerica to engage in the illegal conduct and practices complained of herein.

437.   Plaintiff, on behalf of Comerica, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

438.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

439.   The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding Comerica. Not only is Comerica now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Comerica by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over 9.9 million of its own shares at artificially-inflated prices, damaging Comerica.

440.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct

designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

441.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Comerica not misleading.

442.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Comerica.

443.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the

schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

444.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

445.   Plaintiff, on behalf of Comerica, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

446.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

447.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Comerica's business and affairs.

448.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

449.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Comerica.

450.   In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Direct Express Misconduct.

451.   Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Comerica's business, operations, and prospects. Specifically, the Defendants made false and/or misleading statements and/or failed to disclose that: (1) Comerica was engaged in the Direct Express Misconduct; (2) Comerica continued to report financial and operating metrics while failing to disclose that these results were generated through improper practices; (3) Comerica failed to maintain adequate internal controls; and (4) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

452.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

453.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willingly or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of over $3,236,080.

454.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

455.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Direct Express Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in Direct Express Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Direct Express Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

456.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

457.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Comerica has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

458.   Plaintiff on behalf of Comerica has no adequate remedy at law.

# **FIFTH CLAIM**

## **Against Individual Defendants for Unjust Enrichment**

459.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

460.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Comerica.

461.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sale, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Comerica that was tied to the performance or artificially inflated valuation of Comerica, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

462.   Plaintiff, as a shareholder and representative of Comerica, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

463.   Plaintiff on behalf of Comerica has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

464.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

465.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Comerica, for which they are legally responsible.

466.   As a direct and proximate result of the Individual Defendants' abuse of control, Comerica has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

467.   Plaintiff on behalf of Comerica has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

468.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

469.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Comerica in a manner consistent with the operations of a publicly held corporation.

470.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Comerica has sustained and will continue to sustain significant damages.

471.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

472.   Plaintiff on behalf of Comerica has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

473.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

474.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

475.   In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

476.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

477.   Plaintiff on behalf of Comerica has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Farmer and Herzog for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

163

478.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

479.   Comerica and Defendants Farmer and Herzog are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Farmer's and Herzog's willful and/or reckless violations of their obligations as officers and/or directors of Comerica.

480.   Defendants Farmer and Herzog, because of their positions of control and authority as officers and/or directors of Comerica, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Comerica, including the wrongful acts complained of herein and in the Securities Class Action.

481.   Accordingly, Defendants Farmer and Herzog are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

482.   As such, Comerica is entitled to receive all appropriate contribution or indemnification from Defendants Farmer and Herzog.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Comerica, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Comerica;

(c)     Determining and awarding to Comerica the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Comerica and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Comerica and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Comerica to nominate at least eight candidates for election to the Board; and

Verified Shareholder Derivative Complaint

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Comerica restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 21, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ &**

**GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
            eitank@bgandg.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Kiley Revel, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20 __ day of February, 2024.

DocuSigned by:

Kiley Revel  KRR

A7C13A872865451...

Kiley Revel